# PITTSTON COAL GROUP ET AL. *v.* SEBBEN ET AL.

No. 87–821.   Argued October 3, 1988—Decided December 6, 1988*

---

*Together with No. 87–827, *McLaughlin, Secretary of Labor, et al.* v. *Sebben et al.*, also on certiorari to the same court, and No. 87–1095, *Director, Office of Workers' Compensation Programs* v. *Broyles et al.*, on certiorari to the United States Court of Appeals for the Fourth Circuit.

*Deputy Solicitor General Ayer* argued the cause for the federal petitioners. With him on the briefs were *Solicitor General Fried, Christopher J. Wright, George R. Salem, Allen H. Feldman, Charles I. Hadden,* and *Edward D. Sieger. Mark E. Solomons* argued the cause for petitioners Pittston Coal Group et al. With him on the briefs were *John D. Maddox, Laura Metcoff Klaus,* and *Allen R. Prunty.*

*Paul M. Smith* argued the cause for respondents in all cases. With him on the brief for respondents Sebben et al. were *Joseph N. Onek* and *I. John Rossi. Robert E. Lehrer* filed a brief for respondents Broyles et al. With him on the brief was *Raymond T. Reott*.†

JUSTICE SCALIA delivered the opinion of the Court.

These consolidated cases call into question the Secretary of Labor's interpretation of 30 U. S. C. § 902(f)(2), which, for specified categories of black lung benefit claimants, provides that "[c]riteria applied by the Secretary of Labor in the case of . . . any claim . . . shall not be more restrictive than the criteria applicable to a claim filed on June 30, 1973." Respondents contend that interim regulations applied by the Secretary in adjudicating their claims, see 20 CFR pt. 727 (1988), did not comply with this provision. In *Broyles* v. *Director, OWCP*, 824 F. 2d 327 (CA4 1987) (No. 87–1095), the Court of Appeals for the Fourth Circuit agreed, and directed the Secretary to adjudicate the claims pursued by respondents Broyles and Colley under the less restrictive standards in force on June 30, 1973. See 20 CFR § 410.490 (1973). In *In re Sebben*, 815 F. 2d 475 (CA8 1987) (Nos. 87–821 and 87–827), the Court of Appeals for the Eighth Circuit similarly found the interim Labor regulation invalid under § 902(f)(2), and reversed the District Court's refusal to issue a writ of mandamus compelling the Secretary to readjudicate a class of claims previously considered under the interim regulation, notwithstanding that the Secretary's decision in those cases had become final. We granted certiorari, 484 U. S. 1058 (1988), to decide the statutory issue, which is the subject of

---

†Briefs of *amici curiae* urging reversal were filed for the National Coal Association by *Robert F. Stauffer;* and for the National Council on Compensation Insurance et al. by *Michael Camilleri, Mark Gordon,* and *John Nangle.*

a Circuit conflict,[1] and further to decide, in the event we find the Secretary's interpretation of the statute unlawful, whether mandamus will lie to compel the readjudication of claims decided under erroneous standards but not directly appealed to the courts within the time prescribed.

## I

The black lung benefits program provides benefits to those who have become totally disabled because of pneumoconiosis, a chronic respiratory and pulmonary disease arising from coal mine employment. See *Mullins Coal Co.* v. *Director, OWCP*, 484 U. S. 135, 141 (1987). Originally enacted as Title IV of the Federal Coal Mine Health and Safety Act of 1969 (FCMHSA), Pub. L. 91–173, 83 Stat. 792–798, the program has consisted of two separate parts. Under the original legislation, part B constituted a temporary program of federally financed benefits to be administered by the Secretary of Health, Education, and Welfare (HEW), and part C envisioned a more permanent program operating under the auspices of the Secretary of Labor and relying on state workers' compensation programs where possible.

For part B claims, the FCMHSA provided that the Secretary of HEW "shall by regulation prescribe standards for determining . . . whether a miner is totally disabled due to pneumoconiosis." FCMHSA § 411(b). The regulations relevant here consisted of "permanent" and "interim" components. The permanent HEW regulations generally prescribed methods and standards for establishing elements of statutory entitlement. See 20 CFR §§ 410.401–410.476 (1973). In addition, following (and in response to) the Black Lung Benefits Act of 1972, Pub. L. 92–303, 86 Stat. 150, the

---

[1] Besides the Fourth and Eighth Circuits, two other federal appeals courts have found the interim Labor regulations impermissibly "restrictive" under § 902(f)(2). See *Kyle* v. *Director, OWCP*, 819 F. 2d 139 (CA6 1987); *Halon* v. *Director, OWCP*, 713 F. 2d 21 (CA3 1983). The Seventh Circuit has held to the contrary. See *Strike* v. *Director, OWCP*, 817 F. 2d 395, 404–405 (1987).

Secretary of HEW adopted an interim regulation designed to "permit prompt and vigorous processing of the large backlog of claims" that had developed during the early phases of administering part B. See 20 CFR § 410.490(a) (1973). To deal with a perceived inadequacy in facilities and medical tests, this interim HEW regulation established two classes of presumptions. First, under the presumption at issue here, a claimant could establish presumptive entitlement by showing that "[a] chest roentgenogram (X-ray), biopsy, or autopsy establishes the existence of pneumoconiosis" and that "[t]he impairment . . . arose out of coal mine employment." §§ 410.490(b)(1)(i), (b)(2). The proof of causality required for this first presumption was to be established under § 410.416 or § 410.456, both of which accorded a rebuttable presumption of causality to claimants with 10 years of mining service *and also permitted claimants to prove causality by direct evidence.* See § 410.490(b)(2). The second presumption (drafted in a most confusing manner) enables a claimant to obtain presumptive entitlement by establishing specified scores on ventilatory tests if the miner had "at least 10 years of the requisite coal mine employment." §§ 410.490(b)(1)(ii), (b)(3). Both presumptions were rebuttable by a showing that the miner was working or could work at his former mine employment or the equivalent. § 410.490(c). Miners unable to obtain either presumption had to proceed under the permanent HEW regulations. § 410.490(e). The term of the interim regulation coincided with the term of the part B program, and expired after June 30, 1973, for claims filed by living miners and after December 31, 1973, for survivors' claims. § 410.490(b).

The FCMHSA provided that after part B ceased, part C would shift black lung benefits claims into state workers' compensation programs approved by the Secretary of Labor as "adequate" under statutory standards. FCMHSA § 421. If no statutorily approved program existed in a given State, the Secretary of Labor was to handle the benefits claims aris-

ing in that State directly, and was to prescribe regulations for assigning liability to responsible mine owners. See FCMHSA § 422(a). Events did not unfold as expected, however. The Secretary of Labor approved no state workers' compensation program during the relevant period, see Lopatto, The Federal Black Lung Program: A 1983 Primer, 85 W. Va. L. Rev. 677, 688 (1983), and part C became exclusively a federally run workers' compensation program administered by the Secretary of Labor. Significantly, the FCMHSA provided that "[t]he regulations of the Secretary of Health, Education, and Welfare under section 411(a) of this title shall also be applicable to claims [processed by the Secretary of Labor] under [part C]." FCMHSA § 422(h). Thus, because the interim HEW regulation expired as part C began, the Secretary of Labor adjudicated part C claims exclusively under the permanent HEW regulations.

This state of affairs persisted until Congress passed the Black Lung Benefits Reform Act of 1977 (BLBRA), Pub. L. 95–239, 92 Stat. 95. The BLBRA amended 30 U. S. C. § 902(f) to give the Secretary of Labor authority to establish total disability regulations for part C cases. § 902(f)(1). Pending issuance of the new Labor Department regulations, the BLBRA provided for an interim administrative regime applying standards different from (and more generous than) those of the permanent HEW regulations. Moreover, the BLBRA provided not only that these interim standards would be applied to cases filed or pending during the interim period, but also that claims previously denied would, upon the claimant's request, be reopened and readjudicated under the interim standards. 30 U. S. C. § 945. The nature of the interim standards was to be such that the "[c]riteria applied by the Secretary of Labor in the case of . . . any claim . . . shall not be more restrictive than the criteria applicable to a claim filed on June 30, 1973." 30 U. S. C. § 902(f)(2). That is the language giving rise to the dispute in these cases.

In response to the BLBRA, the Secretary of Labor promulgated the interim regulation at issue here for claims within the scope of § 902(f)(2). This regulation accords a presumptive claim of entitlement to miners having 10 years' experience in coal mines and satisfying one of several "medical requirements," including X-ray, biopsy, or autopsy evidence of pneumoconiosis or ventilatory study evidence identical to that required by the HEW interim regulation. 20 CFR § 727.203(a) (1988). It is central to the present cases that under this interim regulation, unlike the interim HEW regulation (§§ 410.490(b)(1)(i), (b)(2)), a miner cannot obtain the first presumption of entitlement without 10 years of coal mine service. Moreover, the rebuttal provisions of the interim Labor regulation mandate that "all relevant medical evidence shall be considered," § 727.203(b), permitting rebuttal not only on the grounds available in the interim HEW regulation (§ 410.490(c)), but also on the basis that "the total disability or death of the miner did not arise in whole or in part out of coal mine employment" or that "the miner does not, or did not, have pneumoconiosis." See §§ 727.203(b)(1)–(4). A § 902(f)(2) claimant unable to obtain the interim Labor presumption can prove entitlement under either the permanent HEW regulations or the (subsequently issued) permanent Labor regulations, depending on when the claim was filed and adjudicated. 20 CFR § 727.4(b) (1988). The permanent Labor regulations took effect on April 1, 1980. See 20 CFR § 718.2 (1988).

## II

One of the three consolidated cases before us, *Director, OWCP* v. *Broyles*, No. 87–1095, is itself a consolidation by the Fourth Circuit of two separate cases brought by, respectively, Lisa Kay Colley and Charlie Broyles. Respondent Colley's father, Bill Colley, and respondent Broyles filed claims for black lung benefits in 1974 and 1976, respectively. Under 30 U. S. C. § 945(b), both claimants were entitled to

have their claims adjudicated pursuant to the BLBRA amendments. Thus, the interim Labor regulation applied. Since, however, neither claimant had worked 10 years in the mines, neither qualified for the presumption of entitlement under § 727.203, so that both cases were adjudicated under the permanent HEW regulations. In both cases, the Administrative Law Judge found against the claimants, and the Benefits Review Board (BRB) affirmed. The Court of Appeals for the Fourth Circuit reversed the BRB as to both claimants, holding that the unavailability of the interim Labor presumption to short-term miners violated § 902(f)(2) by forcing the application of the "more restrictive" "criteria" found in the permanent HEW regulations. See 824 F. 2d, at 329–330.

The other two consolidated cases before us, *Pittston Coal Group* v. *Sebben*, No. 87–821, and *McLaughlin* v. *Sebben*, No. 87–827, both involve a potential class of claimants consisting of those who

"(1) have filed claims for benefits under the BLBA between December 30, 1969, and April 1, 1980; (2) have claimed a disability due to pneumoconiosis caused by employment in the coal mining industry; (3) have submitted a positive X-ray as proof of the presence of pneumoconiosis; (4) have been denied the benefit of the presumption of pneumoconiosis contained in 20 CFR § 727.203(a)(1) because they did not prove that they had worked ten years in the coal mines; (5) were not afforded the opportunity to submit a claim under 20 CFR § 410.490; and (6) do not have claims under 20 CFR § 410.490 or 20 CFR § 727.203(a)(1) currently pending before the Department of Labor." 815 F. 2d, at 484–485.

These claimants differ from those in No. 87–1095 in that the latter have timely appealed the Labor Department's adverse decisions to the courts, while these claimants have permitted the time for direct appeal to expire. See 815 F. 2d, at 478, 485. The Eighth Circuit ordered the certification of this

class and decided that mandamus would appropriately lie to compel the Secretary of Labor to readjudicate the class members' claims under § 410.490. The panel's opinion relied on the Eighth Circuit's earlier decision in *Coughlan* v. *Director, OWCP*, 757 F. 2d 966 (CA8 1985), which, like *Broyles*, had determined that 30 U. S. C. § 902(f)(2) required the application of § 410.490 standards to claims filed before April 1, 1980. It further held that the claimants' failure to perfect direct appeals from the Secretary's adverse decisions was no obstacle to the present suit.

## III

The statutory text at issue here provides that "[c]riteria applied by the Secretary of Labor . . . shall not be more restrictive than the criteria applicable" under the interim HEW regulation. The respect in which it is claimed here that the Labor criteria are more restrictive is this: whereas under the first presumption of the interim HEW regulation (see *supra*, at 109) a miner would obtain a presumption of entitlement by establishing (1) pneumoconiosis and (2) *either* 10 years of coal mining experience *or* proof that the pneumoconiosis was caused by mining employment, under the interim Labor regulation 10 years' experience is the *exclusive* element of the second factor. In defending the interim Labor regulation, the Secretary maintains that the term "criteria" is ambiguous, and that her resolution of that ambiguity is reasonable and therefore must be sustained. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843, and n. 9 (1984). We disagree. In our view, the statute simply will not bear the meaning the Secretary has adopted.

"Criteria" are "standard[s] on which a judgment or decision may be based." Webster's Ninth New Collegiate Dictionary 307 (1983). It is undisputed that in the current context the standards referred to include the standards for obtaining the *presumption* of entitlement. The distinctive feature of the

interim HEW regulation was precisely its establishment of presumptions, and to fix it as a benchmark without reference to its presumptions would be meaningless.

The Secretary contends, however, that the criteria referred to in § 902(f)(2) do not include the criteria for *all* the elements necessary to a successful claim. Those elements are essentially three: (1) pneumoconiosis; (2) causation by coal mine employment; and (3) total disability (defined as the inability of the claimant to do his former mine work or the equivalent because of pneumoconiosis). See *Mullins Coal Co.* v. *Director, OWCP,* 484 U. S. 135 (1987). The Secretary argues that since § 902(f)(2) is part of the statutory definition section dealing with "total disability," the "criteria" to which it refers must be limited to those bearing upon that element. Total disability criteria would in her view consist of essentially medical (and to some extent vocational) factors, but in no circumstances could include the 10-year-employment requirement at issue here, which obviously goes to causation rather than disability.

The premise of the Secretary's argument—that "criteria" means total disability criteria—has considerable merit, though it is by no means free from doubt. Assuming it is correct, however, we find it unavailing to sustain the Secretary's interim regulation, which in our view does impose more restrictive total disability criteria. For although the categorical 10-year-employment requirement bears *proximately* upon causation, it bears *ultimately* upon total disability as well. The interim HEW regulation had provided, in effect, that if certain evidence of the first two elements of entitlement (pneumoconiosis and causation) was established, the third element (total disability) *would automatically be presumed.* Thus, to increase the requirements for the presumption of causality is necessarily to increase the requirements for the presumption of total disability. No other view of the matter accords with the reality. By making the criteria for proving causation "more restrictive" for miners who

seek a presumption of entitlement and can establish pneumoconiosis, the interim Labor regulation necessarily applies "more restrictive" total disability criteria than those in the interim HEW regulation.

The Secretary goes further still, however, and argues that the legislative history leading up to the enactment of the BLBRA actually discloses a congressional intention to preserve only *"medical* criteria" in the adoption of § 902(f)(2). We need not canvass in detail that legislative history, which shows at most that medical criteria were the focus of the House and Senate debates. It is not the law that a statute can have no effects which are not explicitly mentioned in its legislative history, and the text of the present statute plainly embraces criteria of more general application. We refer not merely to use of the unqualified term "criteria" in § 902(f)(2) itself, but also to the text of related provisions. Immediately preceding § 902(f)(2) in the text of the BLBRA and of the United States Code is § 902(f)(1)(D), which provides that the "Secretary of Labor . . . shall establish *criteria for all appropriate medical tests under this subsection which accurately reflect total disability."* (Emphasis added.) If, as the Secretary contends, Congress intended the word "criteria" to cover only medical criteria (such as ventilatory scores) in both of these simultaneously adopted subsections, it is most implausible that it would have qualified the word in the one but not in the other.[2]

---

[2] The dissent asserts that "criteria" in § 902(f)(2) was merely "shorthand" for the earlier phrase "criteria for all appropriate medical tests," proving the point to its satisfaction by recasting the two statutory provisions into a single sentence where such shorthand reference would be obvious. See *post,* at 133–134. It is difficult to argue with the proposition that a statute can be rephrased to say something different. The point here is that the two provisions *do not* occur within the same sentence, or indeed even within parallel sentences (one being a subparagraph, and the next the beginning of a new paragraph), and that they do not naturally suggest any ellipsis. Moreover, not only is the unqualified term "criteria" used in the separate paragraph immediately *following* the lengthier phrase "criteria

Moreover, the Secretary has suggested no reason why Congress should insist that only the *medical* criteria under the interim Labor regulation be no more restrictive, while being utterly indifferent as to the addition of other conditions for recovery. There was assuredly no belief that the interim HEW medical criteria were particularly precise or accurate. Quite to the contrary, the prologue of the regulation that adopted them made very clear that they were rough guesses adopted for the time being "in the light of limited medical resources and techniques." 20 CFR § 410.490 (1988). Petitioners Pittston Coal Group et al. cite persuasive evidence for the proposition that the X-ray evidence required in § 410.490 does not conclusively establish pneumoconiosis, and that the ventilatory scores employed in that provision "are basically normal values for retired coal miners." Brief for Petitioners in No. 87–821, pp. 31–33. It seems likely that Congress had no particular motive in preserving the HEW interim medical criteria other than to assure the continued liberality of black lung awards. Since that motive applies to *non*medical criteria with equal force, there is no apparent reason for giving the unqualified word "criteria" the unnaturally limited meaning the Secretary suggests.

Even if we agreed with the Secretary's assertion that the "criteria" in § 902(f)(2) consist solely of "medical criteria," we

---

for all appropriate medical tests," but it is also used in the separate subparagraph immediately *preceding* use of the lengthier phrase—namely, in § 902(f)(1)(C), which provides that the Secretary's regulations "shall not provide more restrictive criteria than those applicable under section 223(d) of the Social Security Act." Surely this preceding provision cannot be interpreted as a "shorthand" for a longer provision that has not yet appeared, which means that if the dissent's construction is correct the word "criteria" in the statute is used twice, one paragraph apart, with two different meanings. It is true that § 902(f)(1)(C) was a pre-existing provision, whereas §§ 902(f)(1)(D) and 902(f)(2) were simultaneously added by the BLBRA; even so, one should not attribute to the draftsmen of the BLBRA the use of a shorthand that produces such a peculiarity in the United States Code.

would still conclude that the interim Labor regulation is in violation of the statute. The various criteria that go into determining a claim of entitlement under the interim HEW regulation are closely—indeed, inextricably—intertwined. The configuration of a claimant's nonmedical characteristics effectively determines which "medical criteria" the claimant must establish in order to obtain presumptive entitlement. Thus, in order to make out a prima facie claim of entitlement by submitting X-ray, biopsy, or autopsy evidence establishing pneumoconiosis, a miner proceeding under the interim HEW regulation must fall within either the class of claimants having 10 years of coal mine experience or the class of claimants able to prove that respiratory impairment arose out of coal mine employment. Under the interim Labor regulation, however, this medical evidence no longer suffices for the latter class of claimants; they must in addition submit affirmative proof of total disability (regardless of whether they then proceed under the permanent HEW or the permanent Labor regulations), which would principally involve submission of *medical* proof of disability. See 20 CFR §§ 410.422–410.426 (1988) (permanent HEW regulations); *id.*, § 718.204 (permanent Labor regulations). Thus, for claims brought by miners in that class, the medical criteria are necessarily more restrictive—violating the statutory requirement of "no more restrictive" criteria "in the case of . . . *any* claim."

That the Secretary has increased medical criteria can be more readily understood by transposing the substance of what has occurred here to a more commonplace, analogous context. Just as the black lung program considers both medical and nonmedical criteria for entitlement, college admissions programs typically consider both academic and extracurricular criteria for admission. Assume a hypothetical college that has traditionally tendered offers of admission to all applicants with a B + average, and to all high school student-body presidents and football-team captains with a B

average. · The Board of Trustees, concerned about increasing intellectualism at the institution, issues a directive providing that "the academic criteria applied by the admissions committee in considering any application for admission shall be no more restrictive than those employed in the past." Surely one would not say that this directive permits the admissions committee to terminate the practice of admitting football-team captains with a B average. To be sure, the admissions committee could assert that it was merely applying stricter extracurricular activity requirements for those who had B averages, just as the Secretary here claims that she is merely applying stricter causality requirements for those miners who have the requisite evidence of pneumoconiosis. But the admissions committee would at the same time be raising the academic criteria for all football-team captains — just as the Secretary is raising the medical criteria for miners who can establish causality only by direct evidence.

The Secretary's remaining arguments require little discussion. She points out that Congress could very easily have adopted the entire interim HEW regulation if it had meant to preserve all aspects of the HEW presumptions. But that course (which is in any event no more simple than § 902(f)(2)) would have produced a different result, because it would not have permitted the Secretary to adopt *less* restrictive criteria. The Secretary also observes that in enacting the BLBRA, Congress had before it evidence suggesting that disabling pneumoconiosis rarely manifests itself in miners with fewer than 10 years of coal mine experience. Though that is quite true, we do not sit to determine what Congress ought to have done given the evidence before it, but to apply what Congress enacted—and, as we have discussed, the exclusion of short-term miners from the benefits of the presumption finds no support in the statute. The Secretary and private petitioners cite favorable postenactment statements by key sponsors of the BLBRA. Since such statements cannot possibly have informed the vote of the legislators who

earlier enacted the law, there is no more basis for considering them than there is to conduct postenactment polls of the original legislators. Finally, the Secretary focuses on the interim Labor regulation's additional rebuttal provisions, which permit the introduction of evidence disputing both the presence of pneumoconiosis and the connection between total disability and coal mine employment. Respondents have conceded the validity of these provisions, even though they permit rebuttal of more elements of statutory entitlement than did the interim HEW regulation. The Secretary argues that there is no basis for drawing a line that permits alteration of the rebuttal provisions, but not the affirmative factors addressed by the Secretary. That may or may not be so, but it does not affect our determination regarding the affirmative factors, for which it seems to us the statutory requirements are clear. Respondents' concession on the rebuttal provisions means that we are not required to decide the question of their validity, not that we must reconcile their putative validity with our decision today. (The concession also means that we have no occasion to consider the due process arguments of petitioners, which are predicated upon the proposition that the rebuttal provisions must be more expansive than those in the HEW interim regulation.)

Finally, we address an argument not made by the Secretary—neither before us nor, as far as appears, before any other court in connection with this extensive litigation—but relied upon by the dissent. The dissent believes that the Secretary of HEW made a typographical error in drafting § 410.490, and that the reference in paragraph (b)(3) to subparagraph (b)(1)(ii) should be a reference to subparagraph (b)(1)(i). Even if this revision of what the Secretary wrote (and defended here) made total sense, we would hesitate to impose it uninvited. But in fact it does not bring order to the regulation. It does not, as the dissent contends, eliminate redundancy in § 410.490, but merely shifts redundancy from one paragraph to another. Under the dissent's revi-

sion of the regulation, a claimant submitting X-ray, biopsy, or autopsy evidence of pneumoconiosis under subparagraph (b)(1)(i) would also have to establish disease causation under paragraph (b)(2) and total disability causation under paragraph (b)(3). The last of these requires 10 years of coal mine employment. But if that can be established, the second requirement, contained in paragraph (b)(2), is entirely superfluous, since that provides (by cross-references to §§ 410.416 and 410.456) that a presumption of disease causation is established by 10 years of coal mine employment. (To be sure, §§ 410.416 and 410.456 permit rebuttal of the presumption, but it is plainly not the intended purpose of paragraph (b)(2) to serve as a rebuttal provision rather than a substantive requirement.) Nor would paragraph (b)(2) have any operative effect for a claimant proceeding under subparagraph (b)(1)(ii), since that itself (without reference to paragraph (b)(3)) requires a minimum of 15 years of coal mine employment.

Moreover, even if the Secretary of HEW had made a typographical error, the dissent offers no evidence whatever to establish that in enacting the BLBRA, Congress, unlike past and present Secretaries, was aware of that error, and meant to refer to the regulation as the dissent would amend it. To support congressional agreement with its understanding of the regulation, the dissent produces, from the voluminous legislative history of hearings, debates, and committee reports dealing with this subject, nothing more than stray remarks made by a United Mine Workers official and a single Representative at hearings occurring four years and two Congresses before the BLBRA was enacted, see *post*, at 147–148—remarks that the dissent concedes could be attributable to a simple "misread[ing] [of] the regulation," *post*, at 148, n. 12. We do not think this suffices to justify rewriting § 410.490 as the dissent believes (perhaps quite reasonably) it should have been written.

## IV

Having agreed with the conclusion of both courts below that the interim Labor regulation violates § 902(f)(2), there remains for us to consider the propriety of the orders which that conclusion produced. In *Broyles* (No. 87–1095), the Fourth Circuit remanded the case to the Benefits Review Board for further proceedings in accordance with its opinion. That action was correct—with the clarification, however, that its opinion requires application of criteria no more restrictive than § 410.490 only as to the affirmative factors for invoking the presumption of entitlement, and not as to the rebuttal factors, the validity of which respondents have conceded.

The order of the Eighth Circuit in *Sebben* (Nos. 87–821 and 87–827) is more problematic. There, as we described earlier, the finding that the interim Labor regulation violated § 902(f)(2) was the basis for mandamus instructing the Secretary to readjudicate, under the correct standard, cases that had already become final by reason of the claimants' failure to pursue administrative remedies or petition for judicial review in a timely manner. The Eighth Circuit's rationale for this order is deceptively simple: with respect to both the claims reopened and readjudicated pursuant to 30 U. S. C. § 945, and the claims initially adjudicated under the interim Labor regulation, the Court of Appeals reasoned that the Secretary had never fulfilled her statutory duty because she had failed to adjudicate the claims "under the proper standard." 815 F. 2d, at 482. This rationale does not suffice.

The extraordinary remedy of mandamus under 28 U. S. C. § 1361 will issue only to compel the performance of "a clear nondiscretionary duty." *Heckler* v. *Ringer*, 466 U. S. 602, 616 (1984). Under the provisions of the Longshore and Harbor Workers' Compensation Act made applicable to the adjudication of black lung benefits claims by 30 U. S. C. 932(a), initial administrative determinations become final after 30

days if not appealed to the Benefits Review Board, see 33 U. S. C. § 921(a), and persons aggrieved by a final order of the Board may have such an order set aside only by petitioning for review in a court of appeals within 60 days of the final order, see 33 U. S. C. § 921(c). Determinations of all of the *Sebben* claims became final at one of these two stages. Thus, to succeed in the present cases the *Sebben* respondents had to establish not only a duty to apply less restrictive criteria than those found in 20 CFR § 727.203 (1988), but also a duty to reopen the final determinations. The latter was not established.

With respect to claims filed between the effective date of the BLBRA and that of the permanent Labor regulations, and with respect to claims filed before the effective date of the BLBRA but not yet adjudicated at that time, there is not even a colorable basis for the contention that Congress has imposed a duty to reconsider finally determined claims. And with respect to the already adjudicated pre-BLBRA claims that 30 U. S. C. § 945 required the Secretary to *re*adjudicate under the new, interim Labor regulation, a basis for reopening can be found only if one interprets § 945 to override the principle of res judicata not just once but perpetually, requiring readjudication and re-readjudication (despite the normal rules of finality) until the Secretary finally gets it right. But there is no more reason to interpret a command to *re*adjudicate pursuant to a certain standard as permitting perpetual reopening, until the Secretary gets it right, than there is to interpret a command to *adjudicate* in this fashion. That is to say, one could as plausibly contend that *every* statutory requirement that adjudication be conducted pursuant to a particular standard permits reopening until that requirement is complied with. This is not the way the law works. The pre-BLBRA claimants received what § 945 required: a readjudication of their cases governed by the new statutorily prescribed standards. Assuming they are correct that these new standards would have entitled them to benefits, they

would have been vindicated if they had sought judicial review; they chose instead to accept incorrect adjudication. They are in no different position from any claimant who seeks to avoid the bar of res judicata on the ground that the decision was wrong.

We do not believe that *Bowen* v. *City of New York*, 476 U. S. 467 (1986), upon which the *Sebben* respondents place principal reliance, has any bearing upon the present cases. There we held that the application of a secret, internal policy by the Secretary of Health and Human Services in adjudicating Social Security Act claims equitably tolled the limitations periods for seeking administrative or judicial review. *Id.*, at 478–482. Even assuming that equitable tolling is available under the relevant provisions of the Longshore and Harbor Workers' Compensation Act, the conditions for applying it do not exist. The agency action here was not taken pursuant to a secret, internal policy, but under a regulation that was published for all to see. If respondents wished to challenge it they should have done so when their cases were decided.

Accordingly, we affirm the decision of the Fourth Circuit, and reverse the decision of the Eighth Circuit and remand with instructions to direct the District Court to dismiss the petition for mandamus.

*It is so ordered.*

JUSTICE STEVENS, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE O'CONNOR join, dissenting.

Pneumoconiosis is a serious respiratory disease that has afflicted hundreds of thousands of coal miners who have spent their entire working lives inhaling coal dust. See *Mullins Coal Co.* v. *Director, OWCP*, 484 U. S. 135 (1987). The severity of the disease is directly related to the duration of the miner's underground employment. Although pneumoconiosis may be present in its early stages in short-term miners (*i. e.*, miners with fewer than 10 years of coal mine experience), it is seldom, if ever, disabling unless the employee has

worked in the mines for well over 10 years. Not surprisingly, there is no evidence that any participant in the lawmaking process ever suggested that it would be reasonable to presume that short-term miners—even if afflicted by pneumoconiosis in its early stages—should be presumed to be totally disabled. In fact, the original draft of the Department of Health, Education, and Welfare (HEW) regulation, 20 CFR § 410.490(b) (1973), 37 Fed. Reg. 18013 (1972), like the final draft of the Department of Labor (Labor) regulation under review in this case, 20 CFR § 727.203 (1988), plainly and unambiguously provided that the presumption of total disability for miners who satisfy the relevant medical criteria would not arise unless the miner had at least 10 years of coal mine employment. The only basis for reaching a conclusion that the law now extends this presumption to short-term miners is an unexplained change in the original draft of the HEW regulation, which was either a scrivener's error or a strikingly unique product of incompetent draftsmanship. Nonetheless, the Court today holds that Congress intended such short-term miners to receive the benefit of such an unreasonable presumption.

The specific statutory debate in these cases is over the meaning of the word "criteria" as used in § 2(c) of the Black Lung Benefits Reform Act of 1977 (BLBRA). See 92 Stat. 96; 30 U. S. C. § 902(f)(2). More narrowly, the question is whether the Secretary of Labor (Secretary) could reasonably conclude that Congress chose that word to describe medical criteria but not evidentiary rules or adjudicatory standards. Because my reading of the statute is the same as the Secretary's, I readily conclude that her reading is reasonable.

But even if my reading of this complex legislation revealed mere ambiguity—that is, if I concluded that there were reasonable grounds for construing "criteria" broadly and reasonable grounds for construing it more narrowly—I would nevertheless conclude that these are especially appropriate cases for deferring to the Secretary's interpretation of the statute

she must administer. See, *e. g.*, *K mart Corp.* v. *Cartier, Inc.*, 486 U. S. 281 (1988); *id.*, at 293, n. 4 (KENNEDY, J.) ("[T]he threshold question in ascertaining the correct interpretation of a statute is whether the language of the statute is clear or *arguably ambiguous*") (emphasis added); *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). In explaining why I am convinced that the Court's rather superficial treatment of these cases is profoundly wrong, I shall first discuss the HEW regulation, 20 CFR § 410.490(b) (1988), that serves as the point of reference for the statutory provision at issue today, § 902(f)(2). Next, I shall explain why the statute's face yields no easy answer, and then show how the context of the statute's enactment reveals that Congress was concerned solely with *medical* criteria. After reviewing statistical studies revealing low incidence of pneumoconiosis in short-term miners (*i. e.*, miners with fewer than 10 years' coal mine experience), I shall conclude with a discussion of why the Court's analysis today is inconsistent with standard principles of deference.[1]

I

This litigation exists because of the following problem: As promulgated in 1972, the HEW regulation, § 410.490(b), permitted a miner or his survivor who proved pneumoconiosis through X-ray, biopsy, or autopsy evidence, and who also proved coal mine causation of the disease, to be presumed totally disabled as a result of such coal mine caused pneumoconiosis, regardless of the number of years he worked in the mines. The Labor regulation promulgated in 1978 to adjudicate earlier filed or once-denied part C claims, 20 CFR § 727.203 (1988), requires such miners to prove, in addition, at least 10 years of coal mine employment. Thus, for such miners, the Labor regulation is more restrictive than the

---

[1] I fully agree with the Court's analysis in Part IV of its opinion regarding the availability of mandamus relief in the Eighth Circuit case.

HEW regulation. Since § 902(f)(2) requires that the "[c]riteria applied by the Secretary of Labor . . . shall not be more restrictive than the criteria [applied by HEW]," the legal question presented is whether the Labor regulation is more restrictive in a way prohibited by § 902(f)(2). See Parts II–V, *infra.*

Unfortunately, no one has seen fit to examine the mechanics of the HEW regulation itself; rather, both sides seem to assume that the gap created by that regulation is a given, a firm starting point from which Congress and Labor operated. A close inspection of the HEW regulation and its genesis reveals, however, that the gap was a mistake caused by a scrivener's error, and that no one—not HEW, not Labor, not Congress—has ever intended that short-term miners receive the benefit of a scheme that presumes them totally disabled from coal mine caused pneumoconiosis.

The "interim regulation" promulgated by HEW in 1972 was a response to serious congressional concern about the large backlog of claims that could not await the development of more accurate tests to evaluate disability due to coal mine caused pneumoconiosis.[2] Paragraphs defining the interim presumption of entitlement to benefits appear to have been intended to answer three questions: (1) did the miner have pneumoconiosis? and, if so, (2) was the disease caused by coal mine employment? and (3) was the miner totally disabled as a result of the disease? Instead of requiring a claimant to prove all three elements of entitlement—disease, disease causation, and disability causation—the regulation apparently was intended to create a presumption of entitlement through proof of disease plus proof of a certain minimum number of years of coal mine employment. Let me explain: The answer to the first question was to be provided by reference to the "medical requirements" described in paragraph

---

[2] The basis for the interim regulation is explained in 20 CFR § 410.490(a) (1988), which is set forth *infra,* at 135–136.

(b)(1) of the regulation.[3]   The medical requirements were of two kinds: subparagraph (i) authorized the use of an X ray or biopsy (or an autopsy in the case of a deceased miner) establishing the existence of pneumoconiosis, while subparagraph

---

[3] The entire text of 20 CFR § 410.490(b) reads as follows:

"(b) *Interim presumption.*   With respect to a miner who files a claim for benefits before July 1, 1973, and with respect to a survivor of a miner who dies before January 1, 1974, when such survivor timely files a claim for benefits, such miner will be presumed to be totally disabled due to pneumoconiosis, or to have been totally disabled due to pneumoconiosis at the time of his death, or his death will be presumed to be due to pneumoconiosis, as the case may be, if:

"(1) One of the following medical requirements is met:

"(i) A chest roentgenogram (X-ray), biopsy, or autopsy establishes the existence of pneumoconiosis (see § 410.428); or

"(ii) In the case of a miner employed for at least 15 years in underground or comparable coal mine employment, ventilatory studies establish the presence of a chronic respiratory or pulmonary disease (which meets the requirements for duration in § 410.412(a)(2)) as demonstrated by values which are equal to or less than the values specified in the following table:

|  | Equal to or less than— | |
|---|---|---|
|  | FEV 1 | MVV |
| 67" or less | 2.3 | 92 |
| 68" | 2.4 | 96 |
| 69" | 2.4 | 96 |
| 70" | 2.5 | 100 |
| 71" | 2.6 | 104 |
| 72" | 2.6 | 104 |
| 73" or more | 2.7 | 108 |

"(2) The impairment established in accordance with paragraph (b)(1) of this section arose out of coal mine employment (see §§ 410.416 and 410.456).

"(3) With respect to a miner who meets the medical requirements in paragraph (b)(1)(ii) of this section, he will be presumed to be totally disabled due to pneumoconiosis arising out of coal mine employment, or to have been totally disabled at the time of his death due to pneumoconiosis arising out of such employment, or his death will be presumed to be due to pneumoconiosis arising out of such employment, as the case may be, if he has at least 10 years of the requisite coal mine employment."

(ii) provided that ventilatory studies establishing the presence of a chronic pulmonary or respiratory ailment would be acceptable "[i]n the case of a miner employed for at least 15 years in underground or comparable coal mine employment." Thus, paragraph (b)(1), in essence, allowed an applicant to establish the presence of pneumoconiosis either by direct proof based on an X ray, biopsy, or autopsy, or by inference based on ventilatory studies coupled with a history of 15 years of underground work.

The 15-year requirement is especially noteworthy for two reasons. First, it reminds us of the important fact that pneumoconiosis is a progressive disease. Although miners with only a few years of underground employment sometimes contract simple pneumoconiosis, they seldom, if ever, develop disabling cases of the disease unless they have worked in the mines for at least 10 years. See Part IV, *infra*. Second, the 15-year requirement for those applicants who must rely on ventilatory-study evidence is the source of the confusion in the critical third paragraph of the regulation.

Paragraph (b)(2) of the regulation required an applicant who had satisfied the medical requirements to prove further that his impairment arose out of coal mine employment, in other words, to prove disease causation. Disease causation could be established either by direct evidence or by proof of 10 years of underground employment.[4]

The regulatory answer to the third question—whether the disease had caused total disability—has a peculiar history. As originally drafted, paragraph (b)(3) of the regulation provided that every miner who met any of the medical requirements in paragraph (b)(1) would be "presumed to be totally disabled due to pneumoconiosis arising out of coal mine employment" if he had "at least 10 years of the requisite coal mine employment." 37 Fed. Reg. 18013 (1972). Thus, as

---

[4] This alternative method of proof is not apparent from the text of the regulation quoted in n. 3, *supra*, but is explained in §§ 410.416 and 410.456, which are cross-referenced in paragraph (b)(2).

originally written, the presumption of disability causation was triggered by a 10-year minimum requirement. But since one group of miners—those who had relied upon ventilatory studies to satisfy the medical criteria—already had to show 15 years of underground employment for their medical evidence to be considered probative, it must have been clear to the drafters that they should alter paragraph (b)(3) to apply only to those miners who did not otherwise have to prove a minimum number of years in the mines, namely, those miners who proved disease under subparagraph (b)(1)(i).

Ironically, however, the revision—unexplained in the final promulgation and referred to merely as one of a number of "[m]inor editorial and clarifying changes," *id.*, at 20634— made the 10-year requirement applicable to miners who met "the medical requirements in subparagraph (1)(ii) of this paragraph," instead of those who met the medical requirements in subparagraph (b)(1)(i). *Id.*, at 20646. Thus, as the promulgated regulation reads, paragraph (b)(3) is totally superfluous, because the miners who had to prove 10 years of underground employment are precisely those miners who had to prove 15 years of underground employment by the terms of subparagraph (b)(1)(ii). The drafters, who had initially provided a 10-year minimum requirement for all miners to trigger disability causation, had either (1) dropped such a requirement for the only group of miners to whom it was relevant (the subparagraph (b)(1)(i) claimants) and created a wholly irrelevant disability causation requirement for another group of miners (the subparagraph (b)(1)(ii) claimants), or (2) promulgated a scrivener's error.

The latter assumption is far more plausible for three reasons. First, the confusing and complex character of this regulation makes such human error understandable and not surprising. Second, a substitution of subparagraph (b)(1)(i) for subparagraph (b)(1)(ii) gives the regulation a meaning that comports with the abundant evidence that coal miners

with fewer than 10 years of underground employment seldom, if ever, contract disabling pneumoconiosis. In other words, the regulatory presumption is entirely reasonable if it includes a 10-year requirement. But it is most unreasonable if it does not. Third, if the correction is not made, the inconsistency between the 15-year requirement in subparagraph (b)(1)(ii) and the 10-year requirement in paragraph (b)(3) is simply inexplicable.

The Court responds that understanding the HEW regulation in this fashion would "merely shif[t] redundancy from one paragraph to another," and then explains why in its view paragraph (b)(2) would be rendered superfluous. *Ante*, at 119–120. Three things ought be said about the Court's response. First, reading the HEW regulation to correct for the scrivener's error would not render the disease-causation requirement embodied in paragraph (b)(2) "redundant" or "superfluous." That HEW intended to require proof of 10 years in the mines to invoke a presumption of disability causation, and to permit such proof to invoke a presumption of disease causation, renders neither requirement superfluous; because they are separate elements of the claim, it makes sense to state them separately, and given the vanishingly low incidence of totally disabling coal mine caused pneumoconiosis in short-term miners, it also makes sense to use a 10-year minimum to satisfy both causation requirements. Second, the Court fails to note that this parallelism of requirement between paragraphs (b)(2) and (b)(3) would exist, at least for some miners, regardless of whether the scrivener's error is corrected. For even as the regulation reads on its face, subparagraph (b)(1)(ii) miners, required by paragraph (b)(3) to prove 10 years in the mines to invoke a presumption of disability causation (and by subparagraph (b)(1)(ii) to prove 15 years in the mines to satisfy the medical requirement), in so doing satisfy paragraph (b)(2). Finally—and this is a critical point that the Court simply ignores—the revision of para-

graph (b)(3) is totally inexplicable unless it was unintentional, whereas the current confusion between paragraph (b)(3) and subparagraph (b)(1)(ii) would be eliminated by correcting the scrivener's error. (The Court also states that paragraph (b)(2) would not have any "operative effect for a claimant proceeding under subparagraph (b)(1)(ii)," *ante,* at 120; but this is certainly true regardless of how one reads paragraph (b)(3).)

In sum, as originally drafted, paragraph (b)(3) of the proposed regulation provided that the presumption of total disability was conditioned on at least 10 years of coal mine employment. Had the Secretary of HEW intended to eliminate the 10-year requirement, he could have done so by simply eliminating paragraph (b)(3) in its entirety. It is quite absurd to assume that he deliberately accomplished this objective by means of an obscure "clarifying change" that had the effect of making the 10-year requirement applicable only to those applicants who had already established 15 years of coal mine employment. It is equally senseless to assume that Congress perpetuated this typographical error by etching it into stone in the BLBRA, to which I now turn.

## II

The conclusion that the term "criteria" in § 902(f)(2) of the BLBRA has reference to medical criteria and not to evidentiary or procedural standards is well supported not only by the foregoing discussion, but also by the text of the statute and by its legislative history. Let me begin with the text.

Respondents' case is based primarily on the argument that the phrase "criteria" in § 902(f)(2) must mean all criteria, medical and nonmedical, because otherwise Congress would have written "medical criteria" instead. To this end, respondents point out that in § 902(f)(1)(D) Congress expressly instructed the Secretary to establish "criteria for all appropriate medical tests" for Labor's permanent regulations; by the principle *expressio unius est exclusio alterius,* respond-

ents contend that Congress knew how to narrow the field to "medical criteria" when it so desired, and therefore that the unadorned "criteria" of § 902(f)(2) must include nonmedical factors as well as medical.[5]

---

[5] The full text of § 2 of the Act reads as follows:

"Sec.2. (a) Section 402(b) of the Federal Mine Safety and Health Act of 1977 (hereinafter in this Act referred to as the 'Act') is amended to read as follows:

"'(b) The term "pneumoconiosis" means a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment.'

"(b) Section 402(d) of the Act is amended to read as follows:

"'(d) The term "miner" means any individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal. Such term also includes an individual who works or has worked in coal mine construction or transportation in or around a coal mine, to the extent such individual was exposed to coal dust as a result of such employment.'

"(c) Section 402(f) of the Act is amended to read as follows:

"'(f)(1) The term "total disability" has the meaning given it by regulations of the Secretary of Health, Education, and Welfare for claims under part B of this title, and by regulations of the Secretary of Labor for claims under part C of this title, subject to the relevant provisions of subsections (b) and (d) of section 413, except that—

"'(A) in the case of a living miner, such regulations shall provide that a miner shall be considered totally disabled when pneumoconiosis prevents him or her from engaging in gainful employment requiring the skills and abilities comparable to those of any employment in a mine or mines in which he or she previously engaged with some regularity and over a substantial period of time;

"'(B) such regulations shall provide that (i) a deceased miner's employment in a mine at the time of death shall not be used as conclusive evidence that the miner was not totally disabled; and (ii) in the case of a living miner, if there are changed circumstances of employment indicative of reduced ability to perform his or her usual coal mine work, such miner's employment in a mine shall not be used as conclusive evidence that the miner is not totally disabled;

"'(C) such regulations shall not provide more restrictive criteria than those applicable under section 223(d) of the Social Security Act; and

"'(D) the Secretary of Labor, in consultation with the Director of the National Institute for Occupational Safety and Health, shall establish crite-

This argument proves far too little. In order to understand the meaning of a statutory text, one must at least understand the way in which the drafters used and understood the words they chose.[6] To see how this process works, consider if the two statutory provisions referred to in the preceding paragraph were combined into one sentence, and rephrased as follows: "The Secretary of Labor shall establish criteria for all appropriate medical tests that accurately reflect total disability in coal miners, but criteria applied by the Secretary of Labor to earlier filed or once-denied claims shall not be more restrictive than the criteria applicable to a claim filed on June 30, 1973." It would be quite normal—in fact, the mark of a good writer—to use the phrase "criteria for all appropriate medical tests" the first time, and the shorthand "criteria"—meaning, "criteria for all appropriate medical tests"—the second. In other words, rather than assuming that the *expressio unius est exclusio alterius* principle applies, it is at least equally reasonable (and, as I shall show below in Part III, far more reasonable in these cases) to assume

---

ria for all appropriate medical tests under this subsection which accurately reflect total disability in coal miners as defined in subparagraph (A).

" '(2) Criteria applied by the Secretary of Labor in the case of—

" '(A) any claim which is subject to review by the Secretary of Health, Education, and Welfare, or subject to a determination by the Secretary of Labor, under section 435(a);

" '(B) any claim which is subject to review by the Secretary of Labor under section 435(b); and

" '(C) any claim filed on or before the effective date of regulations promulgated under this subsection by the Secretary of Labor;

shall not be more restrictive than the criteria applicable to a claim filed on June 30, 1973, whether or not the final disposition of any such claim occurs after the date of such promulgation of regulations by the Secretary of Labor.' " 92 Stat. 95–96.

[6] This process is quite similar to the rule of contract interpretation that requires looking to the customary usage of the contract terms at issue. See, *e. g.*, E. Farnsworth, Contracts § 713, pp. 508–511, and n. 10 (1982) (giving as example "usage that 'minimum 50% protein' included 49.5 percent protein").

that the unmodified "criteria" was used as a synonym for the bulkier "criteria for all appropriate medical tests."[7]

### III

A careful reading of the legislative history of the BLBRA leaves no doubt that Members of Congress were concerned with whether the HEW *medical* criteria—not the system of presumptions through which the medical criteria were utilized—were too lenient or too stringent. This is precisely the conclusion reached by the two Circuit Court judges who conducted a thorough investigation into the background of the BLBRA. See *Strike* v. *Director, OWCP*, 817 F. 2d 395, 400–406 (CA7 1987) (Cummings, J.); *Halon* v. *Director, OWCP*, 713 F. 2d 21, 25–30 (CA3 1983) (Weis, J., dissenting in part). To understand fully the certainty of the proposition that Congress intended "criteria" to mean "medical criteria," one must examine closely first the background of the BLBRA and then the congressional debates and Committee Reports that serve as evidence of the context of what became § 902(f)(2).

In 1972, Congress amended the original black lung legislation in several respects. The HEW part B interim regulation that serves as the benchmark for these cases was promulgated as a result of the 1972 amendments, and followed from concerns regarding HEW's claims-approval rate, as explained in the Report of the Senate Committee on Labor and Public Welfare:

"[T]he backlog of claims which have been filed under [part B] cannot await the establishment of new facilities

---

[7] It is also interesting to note that the definition of the word "criterion" in Webster's Third New International Dictionary 538 (1966) is in three parts, the first two of which contain medical references. Thus, the first definition uses as an example "a special constitutional criterion of that person," drawn from the Journal of the American Medical Association, and the second makes reference to "the accepted criteria of adequate diet." None of the definitions makes any reference to legal procedures, presumptions, or burdens of proof.

or the development of new medical procedures. They must be handled under present circumstances in the light of limited medical resources and techniques.

"Accordingly, the Committee expects the Secretary to adopt *such interim evidentiary rules and disability evaluation criteria* as will permit prompt and vigorous processing of the large backlog of claims consistent with the language and intent of these amendments. *Such interim rules and criteria* shall give full consideration to the combined employment handicap of disease and age and provide for the *adjudication of claim[s] on the basis of medical evidence* other than breathing tests when it is not feasible or practicable to provide physical performance tests of the type described [by HEW]." S. Rep. No. 92–743, pp. 18–19 (1972) (emphasis added).

The Report clearly distinguishes between evidentiary rules and medical disability evaluation criteria. The part B interim regulation (20 CFR § 410.490) followed this distinction by providing for certain medical disability evaluation criteria to be adjudicated by means of certain evidentiary rules. In fact, § 410.490(a) explicitly describes the "interim adjudicatory rules" that follow in § 410.490(b) in terms that match the Senate Report's distinction between "evidentiary rules" and "disability evaluation criteria":

"In enacting the Black Lung Act of 1972, the Congress noted that adjudication of the large backlog of claims generated by the earlier law could not await the establishment of facilities and development of medical tests not presently available to evaluate disability due to pneumoconiosis, and that such claims must be handled under present circumstances in the light of limited medical resources and techniques. Accordingly, the Congress stated its expectancy that the Secretary would adopt such *interim evidentiary rules and disability evaluation criteria* as would permit prompt and vigorous processing of the large backlog of claims consistent with

the language and intent of the 1972 amendments and that such *rules and criteria* would give full consideration to the combined employment handicap of disease and age and provide for the adjudication of claims on the basis of medical evidence other than physical performance tests when it is not feasible to provide such tests. The provisions of this section establish such *interim evidentiary rules and criteria.* They take full account of the congressional expectation that in many instances it is not feasible to require extensive pulmonary function testing to measure the total extent of an individual's breathing impairment, and that an impairment in the transfer of oxygen from the lung alveoli to cellular level can exist in an individual even though his chest roentgenogram (X-ray) or ventilatory function tests are normal." (Emphasis added.)

Although HEW's claims-approval rate rose under the part B interim regulation, Labor was still adjudicating part C claims under stricter permanent regulations. In a 1975 House Report that served as a precursor to the BLBRA, the Committee on Education and Labor explained Labor's bind, and offered assistance:

"For some inexplicable reason, [HEW], exercising authority provided under the current law, has literally saddled [Labor] with *rigid and difficult medical standards* for measuring claimant eligibility under part C of the program. The so-called *'permanent' medical standards* now in effect under part C are much more demanding than the so-called *'interim' standards* applied by HEW under part B of the program. HEW points to 'substantial legal and other reasons' for applying *restrictive medical standards* to a claim filed on and after July 1, 1973, and *less restrictive criteria* to a claim filed before July 1, 1973. That assertedly 'substantial' support apparently arises out of language contained in the Senate Report

accompanying the 1972 amendments. In actual fact, HEW has completely misplaced the emphasis of the Senate Report. The Senate directive with regard to the *'interim'* standards clearly spoke to *standards* that would obtain until 'the *establishment of new facilities or the development of new medical procedures.'* (S. Rept. 92–743, at 18) That was the clear and explicit condition underscoring the need for and the duration of *'interim' medical standards.* Under the HEW interpretation, these developments somehow magically occurred at the onset of part C of the program. The Congress *did not* intend in adopting the Senate initiative, as HEW so unequivocally asserts, that this 'interim' approach would suddenly conclude at the termination date for new part B filings. And HEW could hardly intimate that the *'new facilities'* or *'new medical procedures'* referenced so specifically in the Senate Report have, in fact, become reality.

"This provision of the bill would require that *standards no more restrictive than the 'interim' medical standards* shall be equally applicable to part C claims. To the extent that *more restrictive standards* are justified by the presence of *'new facilities'* or *'new medical procedures,'* it is apparent that the Congress must in the future make that determination." H. R. Rep. No. 94–770, pp. 13–14 (1975) (emphasis added).

The terms "medical standards" and "standards" are used interchangeably in this Report; the unmodified term "standards" is used not to distinguish "medical standards," but rather as a matter of style to avoid repetition.

Testifying during 1977 hearings, President Arnold Miller of the United Mine Workers of America explained his support for a requirement that Labor adjudicate earlier filed or once-denied part C claims under medical standards no less restrictive than HEW's part B medical standards:

"The interim standards were by no means ideal. Nearly four of every ten miners' claims were denied under these standards. We have criticized their failure to include new blood gas standards and their overreliance on a single breathing test score. However, these standards can provide a base point, and we urge enactment of a guarantee that any new standards will be no more restrictive than the interim standards. In developing new regulations we urge that [Labor] utilize the lung formation standards established by the I. L. O." Oversight of the Administration of the Black Lung Program, Hearings before the Subcommittee on Labor of the Senate Committee on Human Resources, 95th Cong., 1st Sess., pp. 49–50 (1977).

That a strong supporter of liberalized standards for black lung benefits explained quite carefully that the criteria at issue in this case are medical—specifically, those medical criteria that relate to proof of the disease ("blood gas standards"; "breathing test score"; "lung formation standards")—is certainly strong evidence that the Secretary's position is correct (and, *a fortiori*, reasonable).[8] It is also interesting

---

[8] Similarly, a Social Security Administration (SSA) medical staff member explained that HEW's concern in constructing the part B interim rules was with liberalizing medical test standards:

"The only practicable way to respond to [Congress' desire to decrease the backlog of claims in a liberalized fashion], considering the marked limitations in actually obtaining the physical performance tests, was to establish *criteria which would detect disease*.

"It was acknowledged that *these criteria* would not necessarily describe a level of impairment which would impose a functional limitation on the individual. Thus, the interim adjudicatory rules provide for allowing the claim if (1) a chest roentgenogram, biopsy, or autopsy establishes the existence of pneumoconiosis or (2) the individual's ventilatory function values met a liberalized table provided in the section.

"The liberalized ventilatory function table was established at a sufficiently high level, at a point just below normal for the younger individual, so as not to disadvantage those individuals who might be allowed benefits if the physical performance test could be obtained, and it was recognized it

to note that the ensuing Labor regulation did provide liberalized standards for proving disease by adding "[b]lood gas studies" and "[o]ther medical evidence" to the methods of proof available under the HEW regulation. See 20 CFR §§ 727.203(a)(3) and (4) (1988).

The House Education and Labor Committee returned its Report on the proposed BLBRA on March 31, 1977. H. R. Rep. No. 95–151. Throughout the discussion whether Labor could adopt HEW's more lenient regulation, the Report uses the terms "medical standards" and "screening criteria" to describe what Labor sought to borrow. See *id.*, at 15, 16, 28. The House bill required Labor to adjudicate *all* part C claims—whether earlier filed, once-denied, or later filed—pursuant to criteria not more restrictive than HEW's part B criteria.

The Senate Human Resources Committee approved a bill that authorized Labor to write new part C permanent regulations for all claims adjudicated under its aegis and in so doing "to establish medical test criteria appropriate to disability in coal miners." See S. Rep. No. 95–209, p. 2 (1977). The Committee clarified the Senate's desire to give Labor leeway in establishing "medical test standards." See *id.*, at 13–14. Even the United Mine Workers, who thought HEW's part B interim standards too *stringent*, wrote to the Committee about medical test standards that measure pulmonary capacity; there is no mention of evidentiary standards. See *id.*, at 13. Further, a Congressional Budget Office survey, written when it was assumed that HEW's part B interim standards would be maintained for all part C claims, states that the new

---

could not be obtained in a vast majority of cases." Oversight of the Administration of the Black Lung Program, Hearings before the Subcommittee on Labor of the Senate Committee on Human Resources, 95th Cong., 1st Sess., p. 194 (1977) (statement of Herbert Blumenfeld, M. D., Chief, Medical Consulting Staff, Bureau of Disability Insurance, Social Security Administration) (emphasis added).

measure of total disability "will be equivalent to the interim medical standards." See *id.*, at 25.[9]

House and Senate conferees met to resolve the differences between the two bills, and, not surprisingly, reached a compromise. See H. R. Conf. Rep. No. 95–864 (1978). The Conference Report explains that, pursuant to the Senate's desires, Labor would promulgate for future claims "new medical standards," that is, "criteria for medical tests," and that, in accord with the House's wishes, "the so-called 'interim' part B medical standards are to be applied to all reviewed and pending claims filed before the date the Secretary of Labor promulgates new medical standards for part C cases." *Id.*, at 16. It could not be clearer that the conferees intended to carry over HEW's part B *medical* standards to earlier filed or once-denied part C claims, while new *medical* standards would govern Labor's adjudication of claims filed later. It is also important to note that although the resulting bill required that Labor "shall not provide more restrictive criteria" to its adjudication of earlier filed or once-denied claims, the Conference Report adds that "in determining claims under such criteria all relevant medical evidence shall be considered in accordance with standards prescribed by the Secretary of Labor." *Ibid.* This indicates that Congress was concerned that some *medical* evidence was not being considered; this concern, attached as a clause at the end of a sentence about "no more restrictive criteria," implies that the referenced criteria are medical ones.

The Senate and House debates on the Conference Report provide the most dramatic evidence that Members of both Houses of Congress understood the term "criteria" in

---

[9] During Senate debate, Senator Randolph of West Virginia, the manager of the Senate bill, explained that the bill "authorizes the Secretary of Labor to establish medical criteria for determining total disability in coal mines under part C. Currently the [SSA] imposes on [Labor] its own standards, which are considerably more restrictive than the standards it uses for part B claimants." 123 Cong. Rec. 24239 (1977).

§ 902(f)(2) to refer to "medical criteria." Senator Randolph of West Virginia, the Senate manager of the bill, explained: "Under the conference report, the Secretary of Labor is authorized to promulgate medical standards for the evaluation of part C claims at a time in the future. However, the review of all part B and part C claims and of all claims filed prior to the promulgation of the Labor Department's medical standards will be accomplished with the use of the 'interim' medical standards which were in use after the Black Lung Amendments of 1972." 124 Cong. Rec. 2331 (1978). Senator Javits of New York then described his understanding of the legislation under consideration:

> "I was concerned throughout the consideration of this legislation by the conference committee that the dual responsibilities of HEW and [Labor] for reviewing previously denied claims be exercised in a manner that is fair to all concerned. These claims are to be reviewed by both agencies under *medical criteria no more restrictive than the so-called interim medical standards* which were originally promulgated by HEW for the determination of claims under part B of the act, for which HEW was responsible through June 30, 1973. The bill also provides authority for the Secretary of Labor to promulgate regulations establishing *revised medical criteria*, based on the best medical information available, to be applicable to all newly filed claims.
>
> "The *'interim' standards* as they were applied to determine benefit claims under part B, have been highly controversial and widely criticized. For example, the Secretary of Labor, on September 30, 1977, stated:
>
> "'The *part B standards are not medically sound* for providing benefits to all deserving individuals.'
>
> "I therefore requested that the statement of managers include language to the effect that 'all relevant medical evidence' be considered in applying the *'interim' standards* to the reviewed claims in order to more clearly ex-

plain the intent of the new section [902(f)(2)] of the act created by section 2(c) of the bill. I also suggested the language that 'the conferees expect the Secretary of HEW to administer the *"interim" standards* with a view to the just accomplishment of the purpose of allowing for reviewed Part B claims to establish disability within the meaning of the 1977 amendments as they apply to all reviewed Part B claims.' It is found in the statement of managers under the heading of 'Review.'" *Id.*, at 2333–2334 (emphasis added).

Thus, the Senators who spoke to the issue plainly understood § 902(f)(2) as referring to *medical* criteria.

The House debate reveals a similar clarity of understanding. Representative Perkins of Kentucky, the bill's House manager, explained:

". . . The House bill required that the so-called *interim medical standards* of part B of the program be applied under part C as well. For the most part, the House provision prevailed in conference on this issue and all of the denied and pending claims subject to review under the legislation will be evaluated according to the *'interim' standards*. *These standards* will continue to apply into the future as well, until such time as the Secretary of Labor promulgates new regulations consistent with the authority given him by the bill. With respect to the review responsibility of the Secretary of HEW under the legislation, the *'interim' standards* remain solely applicable, as they have in the past under the HEW-part of the program. As for the Secretary of Labor's review responsibility thereunder, the *'interim' standards* are exclusively and unalterably applicable with respect to every area they now address, and may not be made or applied more restrictively than they were in the past, but they may be considered by the Labor Secretary within the context of all relevant medical evidence according to the methodology prescribed by the Secretary

and published in the Federal Register." 124 Cong. Rec. 3426 (1978) (emphasis added).

Representatives Perkins and Simon, of Illinois, then engaged in the following revealing colloquy:

"Mr. SIMON. Mr. Speaker, I would also like to ask Chairman PERKINS, who also served as chairman of the conference committee, if in his opinion this legislation clearly requires that all denied or pending claims subject to the review provisions of the new section 435 will be subject to reconsideration under the so-called *interim medical criteria* applicable under part B of the black lung program?

"Mr. PERKINS. That is the intent of the legislation, and I would state to the gentleman that a reading of the conference report and of the joint explanatory statement could lead only to that opinion. The new law speaks clearly to this issue; and the relevant legislative history and intent is equally clear. All claims filed before the date that the Secretary of Labor promulgates *new medical standards* under part C are subject to evaluation under *standards* that are no more restrictive than those in effect as of June 30, 1973. And that means the so-called *interim standards.* These are the *standards* HEW has applied under part B and they are the precise and only *standards* HEW will apply to these old claims it must review according to this legislation. As for the Labor Department, it too must apply the *interim standards* to all of the claims filed under part C, at least until such time as the Secretary of Labor promulgates *new standards* consistent with the authority this legislation gives him. We do recognize in the joint explanatory statement that the Secretary of Labor may apply the *interim standards* to its part C claims within the context of all relevant medical evidence. But there is no such directive or requirement imposed on HEW as it fulfills its review duties. We expect that HEW will review these

old claims according to the same *interim criteria* it has applied in the past.

"I would also add here that this legislation gives no authority to the Labor Secretary to alter, adjust, or otherwise change the *interim standards* until such time as he actually promulgates the *new standards* and those *new standards* will apply only to claims filed after the effective date of their promulgation. *Insofar as the interim standards address a medical criteria, they cannot be made more restrictive.*

"Mr. SIMON. Mr. Speaker, I thank the chairman for his response. His views are in perfect accord with my own understanding of the intent underlying these provisions.

.　　.　　.　　.　　.

"Mr. Speaker, I am pleased that the language in this bill is crystal clear on the subject of the *medical standards* that must be used by the Secretary of HEW and the Secretary of Labor in reviewing all pending and denied claims filed before the effective date of *new medical standards* promulgated by the Secretary of Labor for part C cases. *Those standards* can be no more restrictive than the so-called *interim criteria, formally known as the interim adjudicatory standards,* applied by the [SSA] after the 1972 Black Lung Amendments and before July 1, 1973.

[He then quotes § 902(f)(2).]

"It should not be possible to misconstrue the meaning of this language. The Department of Labor is required to apply *medical criteria* no more restrictive than *criteria* being used by the [SSA] on June 30, 1973.

"The conference committee agreed that the Secretary of Labor, in his review of denied and pending cases, is to consider all relevant medical evidence and to promulgate regulations for the use of such evidence. An example of this would be for the Secretary to consider and promul-

gate regulations on the International Labour Organization's respiratory function tests in pneumoconiosis, which is not a form of medical evidence included in the interim adjudicatory standards.

[He then quotes from the Conference Report.]

"So the Secretary is *not confined to the medical evidence of the interim criteria and yet may not prescribe criteria more restrictive than the social security interim adjudicatory standards.*" *Id.*, at 3431 (emphasis added).

Although the Members occasionally used the unmodified terms "standards" and "criteria," and although Representative Simon a few times referred to the "interim adjudicatory standards," the comments read in full leave no doubt that these terms were used interchangeably to refer to what the Members viewed as *medical* criteria.

I have quoted at length from the legislative history of the BLBRA because this history reveals the supposedly "plain" language of the statute to be not so plain after all. In other words, although § 902(f)(2) uses the term "criteria," it is plain that what Members of Congress were concerned about were *medical* criteria. This concern found its way to both sides of the compromise: The Senate prevailed in authorizing Labor to promulgate new permanent part C regulations according to newly developed medical criteria, while the House prevailed in ensuring that Labor's adjudication of earlier filed or once-denied claims would be undertaken pursuant to HEW's part B interim medical criteria. That § 902(f)(2) uses the phrase "criteria" rather than "medical criteria" can only be understood, in the context of the intentions of the Members of Congress who enacted the BLBRA, as the natural culmination of a discussion that used the two phrases interchangeably throughout.[10] Although the Court today ex-

---

[10] Alternatively, even if the use of the unmodified "criteria" in § 902(f)(2) is seen as the product of congressional inadvertence, legislative oversight or inadvertence can at times produce statutory language that does not

presses disbelief as to the proposition that Congress could use both "criteria for all appropriate medical tests" and "criteria" to refer to medical criteria, a contextual understanding of this legislation reveals that attributing to Congress an intent to *distinguish* between these two provisions is, in fact, the unbelievable proposition.   As the genesis and culmination of the compromise reveal, the concerns of both the House and the Senate throughout were with what *medical* criteria should be utilized by Labor in adjudication of part C claims.

IV

There is another body of evidence completely consistent with the understanding that Congress intended "criteria" in § 902(f)(2) to refer to "medical criteria" only: All available data plainly demonstrate that pneumoconiosis is a progressive disease and that although miners with fewer than 10 years of underground employment sometimes contract sim-

───────────

cleanly reflect Congress' intention.   See, *e. g., Examining Board of Engineers, Architects and Surveyors* v. *Flores de Otero*, 426 U. S. 572, 582–586 (1976) (interpreting 28 U. S. C. § 1343(3) to confer jurisdiction upon territorial courts); *Cass* v. *United States*, 417 U. S. 72, 83 (1974) ("In resolving ambiguity, we must allow ourselves some recognition of the existence of sheer inadvertence in the legislative process"); *U. S. Bulk Carriers, Inc.* v. *Arguelles*, 400 U. S. 351, 354 (1971) ("We often must legislate interstitially to iron out inconsistencies within a statute or to fill gaps resulting from legislative oversight or to resolve ambiguities resulting from a legislative compromise" (footnote omitted)); see also *United States* v. *Locke*, 471 U. S. 84, 123 (1985) (STEVENS, J., dissenting) ("[I]t is surely understandable that the author of § 314 might inadvertently use the words 'prior to December 31' when he meant to refer to the end of the calendar year"); *Maine* v. *Thiboutot*, 448 U. S. 1, 14 (1980) (Powell, J., dissenting) ("When the language does not reflect what history reveals to have been the true legislative intent, we have readily construed the Civil Rights Acts to include words that Congress inadvertently omitted"); cf. Posner, Legal Formalism, Legal Realism, and the Interpretation of Statutes and the Constitution, 37 Case W. Res. L. Rev. 179, 191 (1986) ("Interpretation is no less a valid method of acquiring knowledge because it necessarily ranges beyond the text").

ple pneumoconiosis, they rarely, if ever, develop disabling cases of the disease. Although the Court is quite correct in saying that "we do not sit to determine what Congress *ought to have done* given the evidence before it," *ante*, at 118 (emphasis added), comprehending the evidence with which Congress worked can help us determine what Congress *actually did*.[11]

During the 1974 hearings that gave rise to the BLBRA, even supporters of liberalized standards agreed that short-term miners should be subjected to more rigorous rules than long-term miners. See, *e. g.*, Hearings on H. R. 3476, H. R. 8834, H. R. 8835, and H. R. 8838, before the General Subcommittee on Labor of the House Committee on Education and Labor, 93d Cong., 1st and 2d Sess., 367 (hereinafter 1974 Hearings) (Director of Appalachian Research and Defense Fund argues for quite lenient standards for miners with 20 years of experience, and suggests that "[a] miner with 10 or 15 years might be required to meet the interim standards, and a miner with less than 10 years, perhaps, a more rigid standard"). During those same hearings, supporters of liberalized standards from the United Mine Workers and the House both mentioned that 20 CFR § 410.490, the HEW in-

---

[11] As we said just last Term in *Mullins Coal Co.* v. *Director, Office of Workers' Compensation Programs*, 484 U. S. 135, 157–158, n. 30 (1987):

"Like all rules of evidence that permit the inference of an ultimate fact from a predicate one, black lung benefits presumptions rest on a judgment that the relationship between the ultimate and the predicate facts has a basis in the logic of common understanding.

" 'Inferences and presumptions are a staple of our adversary system of factfinding. It is often necessary for the trier of fact to determine the existence of an element of the crime—that is, an "ultimate" or "elemental" fact—from the existence of one or more "evidentiary" or "basic" facts . . . . The value of these evidentiary devices, and their validity under the Due Process Clause, vary from case to case, however, depending on the strength of the connection between the particular basic and elemental facts involved and on the degree to which the device curtails the factfinder's freedom to assess the evidence independently.' *Ulster County Court* v. *Allen*, 442 U. S. 140, 156 (1979)."

terim part B regulation under consideration today, provided a burden-shifting presumption only to miners with at least 15 years of coal mining experience. 1974 Hearings 353 (statement of Bedford W. Bird, Deputy Director, Department of Occupational Health, United Mine Workers); *id.*, at 395 (question from Representative Perkins of Kentucky).[12]

Study after study has revealed one stark, simple fact: Miners with fewer than 10 years in the mines rarely suffer from pneumoconiosis *at all*, and those who have the disease have its earliest, nondisabling stage. The Appendix to the 1977 House Report lists a number of studies that have been conducted concerning black lung disease. H. R. Rep. No. 95–151, at 30–38. The evidence from these studies could not more plainly demonstrate that short-term miners either do not have pneumoconiosis or have it only at its earliest stages. See, *e. g.*, Lainhart, Prevalence of Coal Miners' Pneumoconi-

---

[12] One may conclude that these gentlemen simply misread the regulation; it does take a rather labyrinthian route through this regulation to reach that class of miners who can receive the presumption without at least 10 years in the mines. However, another theory, which follows from the discussion in Part I, *supra*, is available: HEW itself may have overlooked the fact that its interim regulation, as promulgated, permitted one class of miners—those who can prove both pneumoconiosis (through X ray, biopsy, or autopsy) and coal mine causation (independently of the 10-year minimum option)—to receive the presumption without proving at least 10 years in the mines. In other words: All parties to this litigation have assumed that § 410.490 clearly permits miners such as respondents to receive the benefit of the presumption without showing at least 10 years in the mines. Additionally, it has been assumed that Labor's interim presumption, by requiring a 10-year minimum from all miners, is clearly more restrictive for miners such as respondents. However, the evidence from the hearings, Committee Reports, and floor debates reveals that no one assumed that short-term miners would obtain the benefit of the HEW presumption, and therefore lends strength to the theory, set forth in Part I, *supra*, that the gap in the presumption was inadvertent, *i. e.*, a loophole. Accordingly, one could readily conclude as well that the 1977 Congress, which required Labor's interim presumption to utilize no less restrictive criteria than HEW's, was also legislating under the assumption that only long-term miners were affected.

osis in Appalachian Bituminous Coal Miners, in Pneumoconiosis in Appalachian Bituminous Coal Miners 31, 52, 56 (1969) (526 of 536 short-term miners either did not have the disease or were merely suspect for it (98%); 10 short-term miners definitely had pneumoconiosis. "[F]or work periods less than 15 years underground, the occurrence of roentgenographic evidence of definite pneumoconiosis appeared to be spotty among all working coal miners . . . and showed no particular trend. For work periods greater than 15 years underground, there was a linear increase in the prevalence of the disease with years spent underground"); Hyatt, Kistin, & Mahan, Respiratory Disease in Southern West Virginia Coal Miners, 89 American Rev. Respiratory Disease 387, 389 (1964) (33 of 35 short-term miners had no pneumoconiosis (94.3%); 2 had simple pneumoconiosis); Morgan, Burgess, Jacobson, O'Brien, Pendergrass, Reger, & Shoub, The Prevalence of Coal Workers' Pneumoconiosis in U. S. Coal Miners, 27 Archives of Environmental Health 225 (1973) (3,064 of 3,450 short-term miners had no pneumoconiosis (88.8%); 385 had simple pneumoconiosis (11.2%); 1 had complex pneumoconiosis).[13]

Given this overwhelming evidence, it was surely not unreasonable for the Secretary to reject a reading of the BLBRA that would mandate a presumption of total disability caused by pneumoconiosis for every short-term miner who could establish that he had contracted simple pneumoconiosis, which "is generally regarded by physicians as seldom productive of significant respiratory impairment." *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 7 (1976).

---

[13] As another example, two studies presented during 1981 hearings classified 99.3% and 98.9% of miners with fewer than 10 years of coal mine experience in radiographic category "0," revealing no disease whatsoever. Problems Relating to the Insolvency of the Black Lung Disability Trust Fund, Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 97th Cong., 1st Sess., 32 (statement of Dr. J. Donald Millar, Director, National Institute for Occupational Safety and Health, Centers for Disease Control, Public Health Service).

## V

Deference to Labor's construction is appropriate at two different levels of analysis. First, to the extent that the debate is over whether "criteria" means "all criteria" or only "medical criteria," the foregoing sections on the legislative history of the BLBRA and statistical studies of the connection between years in the mines and incidence of pneumoconiosis reveal that reading "criteria" to mean "medical criteria" is almost certainly correct and is certainly reasonable. Second, if one concedes that Congress meant "medical criteria," but simultaneously insists that medical criteria encompass proof of total disability from pneumoconiosis as well as proof of black lung disease itself, the case for deference could not be stronger. For as an interpretive question becomes more technical, the expertise of the agency charged with a statute's administration becomes greater and deferring to its construction rather than importing our own becomes more appropriate. See, *e. g.*, *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S., at 864–866; *Aluminum Co. of America* v. *Central Lincoln Peoples' Utility District*, 467 U. S. 380, 390 (1984). One can define away the problem through hypotheticals about football-team captains and B averages, but in the end such hypotheticals cannot overcome the common-sense proposition that "medical criteria" may well be limited to criteria that are clearly medical — ventilatory study values, how X rays are to be read, etc. — and not extended to second-level medical concerns — *e. g.*, at what point someone is likely to be totally disabled from coal mine employment. That we have evidence of congressional concern with the former, as well as evidence that short-term miners simply do not suffer from pneumoconiosis in the same way that longer term miners do, should be sufficient to sustain the Secretary's reading as reasonable.

In order to sanction a departure from the views of an agency charged with the administration of a complex regu-

latory scheme, we must be convinced that Congress meant something other than the agency thinks it meant. The regulation of the Secretary that is at issue in this case was promulgated in 1978 and has been consistently defended and enforced by four different Secretaries of Labor.[14] Congress delegated the task of implementing this complex and costly piece of legislation to that office and I find no reason to conclude that the Secretary's interpretation exceeded the bounds of the powers delegated to her. Accordingly, I respectfully dissent.

---

[14] That the Secretary's interpretation has survived a change in administration (and political party as well) provides yet another reason to defer to the reasonable view of the Executive Branch on the subject. See, e. g., *Atchison, T. & S. F. R. Co.* v. *Wichita Board of Trade*, 412 U. S. 800, 807 (1973) (plurality opinion of MARSHALL, J.) ("A settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress"); *Motor Vehicle Manufacturers Association of the United States, Inc.* v. *State Farm Mutual Automobile Insurance Co.*, 463 U. S. 29, 40–42 (1983); cf. Garland, Deregulation and Judicial Review, 98 Harv. L. Rev. 505, 585 (1985) ("[A]brupt and profound alterations in an agency's course [after change in administration or Congress] may signal a loss of fidelity to [Congress'] original intent"). It is also relevant that the Secretary was involved in the drafting of the BLBRA. See, e. g., *Miller* v. *Youakim*, 440 U. S. 125, 144 (1979); cf., e. g., *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965) (contemporaneous construction by agency due deference).