RIPPLE, Circuit Judge,
dissenting.
The Black Lung Benefits Act, 30 U.S.C. §§ 901-45, and the regulatory scheme that accompanies it, create a complicated process for adjudicating benefits claims by coal industry employees who become disabled as a result of their employment. As we have noted on numerous occasions, in creating this system, Congress deliberately prized accuracy over finality. The statute accomplishes this task by allowing agency reexamination of claims to a degree far exceeding the norm in our judicial system.[1]
In the case before us, it took the agency and the courts more than twenty years to assess the facts of Harold Crowe’s claims and to reach the ultimate conclusion that he was not entitled to benefits under the Act. In those years, the agency has taken various positions on the factual and legal issues at stake, and the party opposing the benefits claim has changed from the employer coal company, to an unknown entity litigating in the name of the now-bankrupt coal company, to a surety-holder, which, we learned at oral argument, claims in other litigation now pending not to hold the surety in this case. Given this “long *450 and tortuous history,”[2] I understand my colleagues’ aversion to a system that allowed the agency and the defending party to pursue the course each has and a result that denies benefits to Harold Crowe’s widow and children. I nevertheless must conclude that the statute, the regulations and our precedent allow such a course. Consequently, I respectfully must disagree with the court’s conclusion that the agency was required to dismiss the modification petition. Because I further conclude that Mrs. Crowe’s additional arguments fail, I would deny the petition.
I
The present case implicates a relatively unique and, to a significant degree, counter-intuitive modification authority of administrative authorities responsible for the implementation of the black lung benefits program. That authority is best understood in the context of the overall regulatory scheme. I therefore preface my analysis of this case with a sketch of the overall administrative structure.
A. The Black Lung Benefits Act and Amendments
In 1969, responding to a single mine explosion that killed seventy-eight miners in Farmington, West Virginia, and unrelated mine accidents in the following year that took the lives of an additional 170 miners, Congress enacted the first Federal Coal Mine Health and Safety Act (“FCMHSA”), Pub.L. No. 91-173, 83 Stat. 742 (1969) (codified as amended at 30 U.S.C. §§ 801-900). The FCMHSA aimed to “protect the health and safety of coal miners, and to combat the steady toll of life, limb, and lung, which terrorizes so many unfortunate families.” H. Rep. No. 91-563 at 2 (1969), reprinted in 1969 U.S.C.C.A.N. 2503, 2503. In addition to a series of reforms in the previous federal mine safety program, the FCMHSA created the Nation’s first federal entitlement program for miners. The legislators believed the program to be a “satisfactory means of compensating miners who were incapacitated by respirable diseases, as well as the surviving widows and children of miners who had died from the dread black lung.” S.Rep. No. 92-743 at 3 (1972), reprinted in 1972 U.S.C.C.A.N. 2305, 2307 (describing the 1969 FCMHSA). The FCMHSA vested responsibility for administering the program in the Social Security Administration (“SSA”); benefits were paid from SSA’s general funds. Less than three years after the Act’s passage, claims for benefits were more than three times the anticipated levels. Even so, the rate of denials by the SSA for benefits under that first act was more than fifty percent nationwide. Id.
In response, Congress modified and expanded substantially the program in the Black Lung Benefits Act of 1972 (“the Act”), Pub.L. No. 92-303, 86 Stat. 150 (codified as amended at 30 U.S.C. §§ 901-45). In this “remedial law,” Congress attempted to ensure that “the cases which should be compensated[ ] will be compensated. In the absence of definitive medical conclusions there is a clear need to resolve doubts in favor of the disabled miner or his survivors.” S.Rep. No. 92-743 at 11, 1972 U.S.C.C.A.N. 2305, 2315.
In the 1972 Act, Congress gave specific direction to both the SSA, which maintained its jurisdiction over pre-1974[3] *451 claims, and to the Department of Labor, which handled new claims filed in 1974 and, later, the administrative responsibilities for the expansion of the federal entitlement program. These steps were taken in part because of the perception that the earlier program had failed to compensate in appropriate cases. The 1972 Act broadened coverage by requiring the agencies to consider certain types of evidence in making benefits determinations, including lay testimony; it also prohibited the agencies from relying on negative x-rays as the exclusive evidence to deny a claim. See 30 U.S.C. § 928(b). It further expanded the definition of total disability due to pneumo-coniosis [4] to reach more miners and broadened the presumptions favoring the miner. See id. § 902(f).
The 1977 amendments to the 1972 Act further liberalized the standards for establishing eligibility by expanding the definition of miners, extending additional presumptions in favor of claimants and creating the Black Lung Disability Trust Fund. See Black Lung Benefits Reform Act of 1977, Pub.L. No. 95-239, 92 Stat. 95 (1978) (codified as amended in scattered sections of 26 U.S.C., 29 U.S.C. and 30 U.S.C.). In addition, the Act required the Department of Labor to reexamine pending and already denied claims at the request of the claimant under standards at least as generous as those in effect in 1973. Id. §§ 2(c), 15. Even as the substantive grounds and the presumptions for entitlement expanded, the Act continued to place the burden on the miner to prove the existence of pneumoconiosis, and the legislative history made apparent that “a mere showing of a respiratory or pulmonary impairment will not be sufficient to establish a claim for benefits.” S.Rep. No. 92-743 at 13, 1972 U.S.C.C.A.N. at 2317. After this series of increasingly generous amendments to the original entitlement program, and largely in response to mounting deficits in the Trust Fund, the Act was amended in 1981 to create more restrictive eligibility requirements.[5] Specifically, three out of the five presumptions in favor of claimants were eliminated; rules binding the agency to accept certain positive x-ray diagnoses of pneumoconiosis were eliminated. See Black Lung Benefits Amendments of 1981, Pub.L. No. 97-119, Title II, 95 Stat. 1635, 1643 (1981) (codified as amended in scattered sections of 30 U.S.C.); Newman v. Dir., OWCP, 745 F.2d 1162, 1164 n. 2 (8th Cir.1984).
In addition to the Act’s substantive provisions, it also provided for distinct administrative structures and procedural rights for claimants. Beginning with the original 1969 Act, the program incorporated by reference many of the adjudication procedures under the Longshore and Harbor Workers’ Compensation Act, 33 U.S.C. §§ 901-50 (“the Longshore Act”), also administered by the Department of Labor. Those procedures include the right to a trial under the Administrative Procedures Act and to both administrative and judicial appeals. See 33 U.S.C. §§ 919(d), 921; 5 U.S.C. § 554. In addition, and particularly relevant to the case before us, since *452 1927, the Longshore Act has included a provision permitting modification of a final decision on benefits entitlement. See 33 U.S.C. § 922. By the time the procedures of the Longshore Act had been incorporated into the black lung program, the modification provision allowed any party, or the district director on his own initiative, “at any time prior to one year after the date of the last payment of compensation, whether or not a compensation order has been issued, or at any time prior to one year after the rejection of a claim,” to seek review of “a compensation ease in accordance with the procedure prescribed (for original claims),” for the purpose of modifying the order. Id.[6] The grounds for modification are “a change in conditions or ... a mistake in a determination of fact.” Id.
The legislative history for the 1969 FCMHSA offers nothing specifically to explain the choice to incorporate the Long-shore Act’s procedures, much less the modification authority. See H.R.Rep. No. 91-761 (1969) (Conf.Rep.), reprinted in 1969 U.S.C.C.A.N. 2578, 2606 (stating, without elaboration, that “the applicable provisions of the [Longshore] act of March 4,1927, as amended, shall be applicable” to claims filed on or after January 1, 1973). The foregoing account demonstrates that there have been significant changes to the substance of the Act, many of which expanded the Act’s scope of coverage. A constant, however, has been the Act’s integration of the Longshore Act’s procedures to the long-term black lung benefits claims, including the modification authority.
B. The Regulations
Pursuant to the Act, the Secretary of Labor[7] developed an extensive regulatory scheme. In brief, in its current form, it requires claims to be presented first to a district director in the Office of Workers’ Compensation Programs (“OWCP”) of the Department of Labor, who will issue an order regarding entitlement to benefits. The claimant or the operator (or its successor) may petition for a trial before an ALJ, review by the Benefits Review Board (“BRB” or “Board”) and review in an appropriate Court of Appeals. See 20 C.F.R. §§ 725.401-83 (Subparts E and F).
With respect to modification, the regulations in place in 2000, at the time of the modification petition in the present case, added little beyond that specified in the statute. See 20 C.F.R. § 725.310 (2000).[8] In addition to stating that the “modification proeeeding[] shall be conducted in accordance with the provisions of this part as appropriate,” the applicable regulations specifically provide that “[additional evidence may be submitted by any party or *453 requested by” the decisionmaker.[9] Id. § 725.310(b) (2000).
C. Precedents Interpreting the Modification Authority
The Supreme Court has long understood the modification provision in the statute to convey broad authority. In Banks v. Chicago Grain Trimmers Ass’n, 390 U.S. 459, 461-64, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968), a claimant filed a second petition for benefits, alleging a completely different theory of liability and different evidence in support of that theory. The court of appeals had rejected the second petition, concluding it was barred by res judicata. The Supreme Court, however, held that the second petition was an appropriate request for modification within the authority granted by the statute. Specifically, the Court acknowledged that among the mistakes of fact the statute permitted the agency to correct was a mistake of ultimate fact— i.e., the liability of the employer. It is significant that the broad reading of the modification authority in the Longshore Act in Banks predates the decision of Congress to incorporate its procedures into the first black lung program, in the FCMHSA of 1969.
Several years later, in O’Keeffe v. Aerojet-General Shipyards, Inc., 404 U.S. 254, 92 S.Ct. 405, 30 L.Ed.2d 424 (1971) (per curiam), the Court again interpreted broadly the modification provision:
[O]n its face, the section permits a reopening within one year “because of a mistake in a determination of fact.” There is no limitation to particular factual errors, or to cases involving new evidence or changed circumstances. The [Longshore] Act at one time did authorize reopening only on the “ground of a change in conditions,” 44 Stat. 1437, but was amended in 1934 expressly to “broaden the grounds on which a deputy commissioner can modify an award ... when changed conditions or a mistake in a determination of fact makes such modification desirable in order to render justice under the act.” S.Rep. No. 588, 73d Cong., 2d Sess., 3-4 (1934); H.R.Rep. No. 1244, 73d Cong., 2d Sess., 4 (1934). The plain import of this amendment was to vest [the agency] with broad discretion to correct mistakes of fact, whether demonstrated by wholly new evidence, cumulative evidence, or merely further reflection on the evidence initially submitted.
Id. at 255-56, 92 S.Ct. 405. The court of appeals in O’Keeffe had refused modification where no new evidence had been presented, concluding that “ ‘the statute simply does not confer authority upon the Deputy Commissioner to receive additional but cumulative evidence and change his mind.'” Id. at 254-55, 92 S.Ct. 405 (quoting the Fifth Circuit’s opinion). The Supreme Court’s reversal of that decision directed that “not only could modification be used to challenge the ultimate determination of liability, but modification also could take place without submission of ‘new' evidence.” Old Ben Coal Co. v. Dir., OWCP (Hilliard), 292 F.3d 533, 540 (7th Cir.2002) (internal citations omitted). O’Keeffe did, however, draw on legislative history to require that modification “render justice under the act,” 404 U.S. at 255, 256, 92 S.Ct. 405; that principle continues to inform the discretionary determinations made by the agency on modification.
*454 Our own decisions have followed the Supreme Court’s direction to interpret the modification provision to reach broadly with respect to both substance and procedure. In Hilliard, we reviewed the agency’s denial of an employer’s modification petition. In denying modification, the ALJ had noted that modification was discretionary and subject always to the limitation that it render justice under the Act; specifically, the agency believed that the need to render justice should be “balance[d] ... against the need for finality in decision making.” 292 F.3d at 537 (quotation marks omitted). The agency’s language made clear that it was displeased with the employer’s tactics in the case before it:
“The modification provisions of the Act are not intended to allow a party to lay back, and, having received an adverse decision, take a second (or in this case, a third) bite at the apple by gearing up and presenting evidence that it could have presented at the first hearing on the claim. To do so would allow the Employer, under the guise of an allegation of mistake, to retry its case simply because it feels that it can make a better showing the next time around.”
Id. at 537 (quoting the ALJ opinion). We reversed. Drawing on the Supreme Court precedent and a “wealth of circuit cases,” id. at 541, we focused on the breadth of the provision and the conscious decision of Congress to elevate accuracy over finality embodied in the modification provision. We reviewed decisions that overturned modified awards and concluded that, although the preference for accuracy could be overcome in some situations by various considerations and specific interests related to finality could be among them, the “concern for finality simply cannot be given the same weight that it would be given in a regular civil proceeding in a federal district court.” Id. We noted that abuse of the adjudicatory system was one potential basis for refusing modification, and further concluded that “an ALJ would be entitled to determine that an employer was employing the reopening mechanism in an unreasonable effort to delay payment.” Id. at 547. In finding that the ALJ in Hilliard had failed to ground her decision in the policies of the statute, however, we left the determination of the “universe of actions that overcomes the preference for accuracy” within the sound discretion of the agency, guided by the “justice under the Act standard.” Id. (internal quotation marks omitted).[10] We specifically ruled that this standard should not be confused with the more amorphous and familiar “interests of justice” standard; the relevant standard directly “cabins the discretion of the ALJ to keep in mind the basic determination of Congress that accuracy of determination is to be given great weight in all determinations under the Act.” Id. (emphasis added).
We further noted that the statute provides a broad timeline for requesting modification by specifying that requests need only be filed within one year of a claim’s rejection and including no limitation on subsequent requests. We cited with approval cases from other circuits that had concluded that the “rejection of a claim” language in § 922 includes rejection of another modification petition itself, thereby lengthening substantially the amount of time in which a claim could be pending. Id. at 540-41 (citing cases from the Third and Fourth Circuits).
*455 II
Our review task is well-defined. On petition for review of a decision of the Benefits Review Board in proceedings under the Black Lung Benefits Act, 30 U.S.C. §§ 901-45,
our task is to review the ALJ’s decision which the Board affirmed. We do so under a deferential standard of review: We will not overturn the ALJ’s decision if it is rational, supported by substantial evidence and consistent with governing law. We affirm an ALJ’s factual findings if they are supported by relevant evidence that a rational mind might accept as adequate to support a decision. We do not reweigh the evidence, resolve inconsistencies in the record, make credibility determinations, or substitute our inferences for those drawn below. Though we defer to the ALJ’s factual determinations, we review questions of law de novo.
Roberts & Schaefer Co. v. Dir., OWCP, 400 F.3d 992, 996 (7th Cir.2005) (internal quotation marks and citations omitted). “After this examination, we then review the Board’s decision to determine whether the Board adhered to its scope of review and whether it committed any legal error.” Blakley v. Amax Coal Co., 54 F.3d 1313, 1318 (7th Cir.1995).
Florence Crowe, widow of Harold Crowe, challenges the decision of the ALJ, affirmed by the Benefits Review Board, reversing an award of benefits to Mr. Crowe. She raises three arguments in support of remand to the agency. First, she contends that the action should have been dismissed when the coal operator was dissolved and no other party assumed responsibility for the modification petition. Second, she claims that the ALJ erred in concluding that modification would serve justice under the Act. Finally, she claims that an earlier decision of the Benefits Review Board erroneously remanded the case back to the ALJ and that we should review and reverse that earlier decision. My colleagues premise their grant of the petition on Mrs. Crowe’s first reason. Because I find no merit in that argument, I shall discuss as well her alternate arguments.
A. Requests for Dismissal
As the court recounts, Mr. Crowe requested that the modification petition pending in his case be dismissed when Horizon Natural Resources, the successor in interest to Zeigler, Mr. Crowe’s former employer, was dissolved in bankruptcy. Indeed, he moved to dismiss when no party had intervened in 2005, and his motion was denied by the Board. Later, when Travelers, the holder of a surety from Zeigler, moved to intervene, Mr. Crowe opposed the motion and has continued his objection throughout the proceedings.[11] Mrs. Crowe now contends that it was error for the ALJ and the Board to refuse dismissal of the modification petition when it had no named proponent and to allow Travelers’s intervention in 2009. I consider those arguments in turn.
At the outset, it should be noted that, in the dissolution proceeding, the bankruptcy court entered an order relevant to the present matter. That court directed that all pending black lung claims against debtors (i.e., former coal operators whose interests had passed to Horizon)
shall not be dismissed but instead, allowed to proceed to final adjudication with the applicable debtors as parties. *456 Finally adjudicated claims that result in benefit awards will not be enforced against the Debtors but rather will form the basis for collection from any other responsible parties therefore, including without limitation, the Debtors[’] sureties under the [black lung statute].
Old Ben Coal Co. v. Dir., OWCP, 476 F.3d 418, 419 (7th Cir.2007) (involving the Horizon bankruptcy) (modifications in original) (quotation marks omitted).
1. Dismissal at the Agency was not Required by our Precedents
The panel majority’s decision faulting the agency for failing to dismiss the action rests on two prior cases of this court, which I believe merit detailed examination. First, in Old Ben Coal Co. v. Director, OWCP (Melvin), 476 F.3d 418 (7th Cir.2007), a miner had been awarded benefits in a final order of the Board. A bankruptcy then resulted in the dissolution of the employer, but the insurer, who could continue to face liability, sought to challenge the agency decision without becoming a party to it. At the insurer’s behest, a petition for review was filed in this court, but in the name of the then-dissolved employer. We dismissed the action. Because neither the insurer nor anyone else had “sought party status,” the only entity seeking to invoke our jurisdiction was “the ghost of’ the dissolved employer. Id. at 420. A non-party (including the surety bond holder) seeking to protect some contingent interest could not “direet[ ] its lawyer to represent a named party that [by virtue of its dissolution] was not a real party in interest.” Id. We issued our decision in Melvin, which, as noted above, involved the same bankruptcy, in January 2007.
Thereafter, in June 2007, we issued another decision in Zeigler Coal Co. v. Director, OWCP (Griskell), 490 F.3d 609 (7th Cir.2007), that also involved the same bankruptcy and same surety. We noted in Griskell that, in February 2007, Travelers had moved to intervene while that case was pending in our court. We allowed the intervention, although we considered it untimely, noting that Travelers “showed good cause to intervene because, until our decision in [Melvin], [Travelers] had no reason to believe that intervention was necessary to protect [its] interest.” Id. at 610 n. 1.
Both Melvin and Griskell were issued after Mr. Crowe’s motion to dismiss before the agency and neither is squarely on point because the issue of party status implicated Article III jurisdictional concerns before this court, not the right to proceed before the agency. Nevertheless, they are instructive. We permitted untimely intervention in Griskell in part because we had concluded that the insurer, relying on the bankruptcy court’s order, had no reason to believe intervention was necessary. Our ruling suggests that, at least until Melvin was issued, an insurer involved in this particular bankruptcy and under the bankruptcy court’s order would have been reasonable in its belief that it could litigate in the name of the dissolved employer.
The panel majority’s opinion notes that Griskell did not “amplify] or enlarge[] upon” what it identifies as Melvin’s basic holding, that a dissolved entity “was not a real party in interest to a proceeding under the [Black Lung Benefits Act].” Maj. Op. at 443. Our holding in Melvin, however, was premised explicitly on the fact that the entity seeking to invoke the jurisdiction of this court was a non-existent corporation. It was not that Old Ben ceased to be a real party to a proceeding under the Act — it had ceased to exist at all; as such, it had nothing to lose or gain from the suit and lacked standing in our court. Although our decision in Melvin noted that the surety was entitled to intervene in the *457 administrative proceeding, we did not state that it would have been required to do so; indeed, we also acknowledged that it might have intervened in our court to protect its claimed interests. Griskell’s significance is that it explicitly states that the failure to have intervened as a party in interest pri- or to 2007 is not fatal.
When Mr. Crowe’s own case is placed against the timeline of our precedents, the reasonableness of the agency’s decision not to dismiss the action prior to the formal intervention of Travelers is apparent. Although Mr. Crowe sought dismissal before the ALJ and repeatedly objected before the Board to participation of counsel on behalf of the dissolved employer, he did so before Melvin and Griskell rejected the respective insurers’ course in this court. At the time both Melvin and Griskell were decided, the Board had issued its order affirming the ALJ’s evidentiary conclusion that Mr. Crowe had not demonstrated an entitlement to benefits. However, the Board had remanded the case so that the ALJ could determine whether modification served justice under the Act. The opposing party, still litigating in the name of the bankrupt employer pursuant to the bankruptcy court’s order, sought rehearing en banc. The Board did not deny that motion until August 2007, shortly after Griskell was decided. The remand order then placed the case back before the ALJ. At that point, in early 2008, Travelers, the surety holder, filed its first motion to intervene over Mr. Crowe’s renewed objection; [12] although that motion was denied, see Order of ALJ at 2 n. 5 (Jan. 30, 2009), the Board found that denial to have been in error, see Order of BRB at 1-2 (Oct. 21, 2009), and permitted intervention in 2009.
In short, Travelers was not engaged in improper conduct when it waited from the time of the Horizon bankruptcy until 2009 to become a party to the case. The course that the employer’s counsel chose was in conformity with existing law and a court order prior to Melvin and Griskell. When, in 2007, those cases made clear that the appropriate way of proceeding was not to continue the proceedings in the name of the employer, but by formal substitution of the surety, Travelers took its first opportunity to seek intervention upon remand of the case. The proceedings continued essentially uninterrupted by the issue of who actually litigated the modification petition. The relevant question in the modification has always been substantive entitlement to benefits based on medical evidence.
In sum, the legal authorities did not require dismissal, and the administrative record simply does not establish the kind of misconduct or abandonment that would have required the ALJ to dismiss the case in the reasonable exercise of his discretion.[13]
*458 2. The Agency Acted within its Discretion in Permitting Intervention
After rejecting Travelers’s argument that the timing of its intervention was reasonable in light of the development of the law of our circuit, the panel majority notes that Travelers’s “behavior, though not commendable, may be legitimate, provided that the delay ... did not prejudice Mr. and Mrs. Crowe.” Maj. Op. at 443. As the panel majority notes, there is no specific requirement in the statute or the regulations requiring intervention to occur within a specific time frame, but the court will “suppose that the regulations contemplate that an insurer ... will seek intervention in a timely manner.” Id. at 442. In determining whether intervention should be permitted in this case, the panel majority cites authorities, not specific to the agency context, describing the factors that courts should consider in determining whether to permit a delayed intervention. After noting that chief among those factors is the prejudice suffered by the opponent, the panel majority concludes that there was substantial prejudice to the Crowes in this case and reverses.
Respectfully, I cannot agree. Given the substantial discretion the agency enjoys in the conduct of proceedings under the Act, it is not our role to engage in essentially de novo review of the intervention question. Nor do I believe that “ ‘all of the circumstances of the case,”’ Maj. Op. at 444 (citing 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1916 (3d ed. 1998 & Supp.2010)), demonstrate that the intervention should have been denied. Although the Crowes were required to continue participating in the proceedings over a period of several years, the majority identifies no specific prejudice to their case. First, the majority acknowledges that briefing continued with counsel for the surety participating, albeit in the name of the employer. See Maj. Op. at 451 n. 5. Second, the record in this case was complete by the time that Horizon was dissolved; the ALJ did not permit the introduction of additional evidence, but adjudicated the petition with the evidence originally submitted by Zeigler. See Decision and Order of ALJ at 4-5 (July 1, 2005) (declining to reopen the record for additional evidence). Finally, in the period of time after Melvin and Gris-kell demonstrated that intervention was appropriate, the case was essentially stagnant before the agency for a period of several months, awaiting a decision on already filed motions. Once the final remand order was issued, Travelers moved to intervene within a reasonable time frame, and, again, the Crowes suffered no direct prejudice in the interim.
The Board acted within the bounds of its discretion when it permitted Travelers to intervene. Nothing in the statute or case law required a different result. It was understandable for the insurer to believe that it could proceed in the former employer’s name until our decisions in Melvin and Gñskell. Further, given that no specific prejudice resulted for the Crowes, it was within the discretion of the ALJ to allow the case to continue under the employer’s name and was further within the discretion of the Board to permit the intervention in 2009.
*459 B. Justice Under the Act
Mrs. Crowe next contends that the ALJ erred in concluding that modification would serve justice under the Act. Specifically, she avers that the employer behaved improperly in refusing to pay benefits under the final award. Further, she contends that the ALJ’s decision was capricious because the ALJ already had concluded, at earlier stages in the proceeding, that the employer had failed to act with diligence.[14]
As we have noted, the statute vests an ALJ with broad discretion in modification proceedings. That discretion is cabined by the requirement that modification must serve justice under the Act. O’Keeffe, 404 U.S. at 255, 256, 92 S.Ct. 405. As we also have noted, that principle is tied to the Act’s preference for accuracy above finality in most circumstances. Although an ALJ is entitled, in various circumstances, to conclude that a party’s conduct is such that a modification in its favor is improper, see Hilliard, 292 F.3d at 547, Mrs. Crowe has not invited our attention to any case in which we have required such a conclusion.
It is important to remember the posture at which this question arises in this case. The ALJ in the modification proceedings had concluded that, on the merits and in consideration of all the evidence before him, Mr. Crowe’s claim to black lung benefits should fail. Mr. Crowe, and now Mrs. Crowe, seek to employ the justice under the Act standard to contend that, despite that finding, Mrs. Crowe should continue to receive benefits because of the conduct of the employer. Certainly, the proceedings in this case are protracted and the matter might well have been resolved much sooner had the employer better defended the case at the outset. Moreover, there appears to be no significant dispute that the surety’s failure to pay benefits while the modification proceeding continued was in violation of law. See 20 C.F.R. § 725.502(a)(1).[15] Nevertheless, the ALJ was in the best position to determine whether modification served justice under the Act. We already have said that, “[t]o the extent that an ALJ determines that there are important reasons grounded in the language and policy of the Act that overcome the preference for accuracy, that determination should not be disturbed.” Hilliard, 292 F.3d at 547. The same is true when the ALJ finds that the preference for accuracy outweighs competing considerations in a given case.
Here, the ALJ properly considered Mrs. Crowe’s arguments that justice under the Act would not be served by denial of a modification that he already had concluded was warranted by the evidence. He acknowledged the unlawfulness of the employer’s conduct, but found it did not work a manifest injustice to Mr. Crowe because his benefits were paid by the Trust Fund during the litigation.[16] The ALJ consid *460 ered the diligence of the employer and the quality of evidence produced in the modification proceeding.[17] His opinion makes clear that, considered in whole, the employer’s conduct in pursuing modification was not sufficiently problematic that it should upset the “statutory preference for accuracy of benefits determination.” Decision and Order of ALJ at 6 (Jan. 30, 2009) (internal quotation marks omitted).
In sum, it was within the discretion of the ALJ to conclude that the interest in accuracy, which occupies a unique place in black lung litigation, should not be outweighed by the employer’s — or the insurer’s — conduct in this litigation.
C. Review of Earlier Board Decision
Finally, Mrs. Crowe asks us to review the Board’s decision of August 24, 2004, in which it remanded an ALJ’s previous award of benefits, concluding that the ALJ made an error of law. In that decision, the Board determined that the ALJ had failed to provide a medical reason for crediting the testimony of the single treating physician who diagnosed pneumoconiosis over the employer’s physicians who, upon reviewing Mr. Crowe’s medical records, determined that pneumoconiosis could not be diagnosed. The parties have submitted various arguments about the reviewability of this decision, a remand order that has twice been succeeded by additional orders of the Board on the merits.
As we noted at oral argument, it is self-evident that our jurisdiction extends to questions addressed in interlocutory orders of the relevant agency or court.[18] Therefore, the difficulty for Mrs. Crowe on this issue is not, as Travelers contends, that we cannot reach the prior Board decision because it is not a final order. Rather, the difficulty is that the Board’s legal *461 determination did not control the ALJ’s conclusion on remand. The remand simply provided the ALJ an opportunity to reexamine the evidence.[19] In doing so, the ALJ concluded that the prior award was erroneous in its determination that the evidence supported a diagnosis of pneumo-coniosis. Although noting the basis for the Board’s remand, the ALJ’s focus was instead on a comprehensive reexamination of the record.
In short, we need not decide whether the Board misstated our precedents when it remanded so that the ALJ could provide a medical reason for preferring the treating physician’s diagnosis. Any such error would be harmless in the present case because, in the remanded proceedings, the ALJ’s total reevaluation of the claim led to the conclusion that the record did not support Mr. Crowe. That determination was based not on the Board’s medical reason standard, but on a complete review of the medical evidence from top to bottom.
Consequently, I must conclude that the ALJ and the Board acted within then-discretion in denying Mr. Crowe’s motion to dismiss and in permitting delayed intervention by Travelers. Further, given the Act’s strong preference for accuracy in benefits determinations, the ALJ did not abuse his discretion in determining that justice under the Act was served by the modification. Finally, although we may review interlocutory orders of the Board, any legal error in its 2004 ruling proved inconsequential; the ALJ’s opinion completely reevaluated the evidence and made clear that he believed the record did not support Mr. Crowe’s claims. Accordingly, I would deny the petition.

. See Jessee v. Dir., OWCP, 5 F.3d 723, 725 (4th Cir.1993) (“[T]he 'principle of finality' just does not apply to Longshore Act and black lung claims as it does in ordinary lawsuits.” (citing Banks v. Chicago Grain Trimmers Ass’n, 390 U.S. 459, 461-65, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968))).

. Old Ben Coal Co. v. Dir., OWCP (Hilliard), 292 F.3d 533, 535 (7th Cir.2002).

. The 1972 Act moved the transition from SSA to the Department of Labor from Decem-her 31, 1972, to December 31, 1973. Pub.L. No. 92-303, § 5(2), 86 Stat. at 155. Much of the SSA’s remaining authority with respect to the pre-1973 claims eventually was trans *451 ferred to the Department of Labor in 1997. See Black Lung Consolidation of Administrative Responsibility Act, Pub.L. No. 107-275, 116 Stat. 1925 (2002) (codified as amended at 30 U.S.C. §§ 921-24).

. "The term 'pneumoconiosis' means a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment.” 30 U.S.C. § 902(b) (addition by the Black Lung Benefits Reform Act of 1977, see 20 C.F.R. § 725.1(f)).

. See John S. Lopatto III, The Federal Black Lung Program: A 1983 Primer, 85 W. Va. L.Rev. 677, 678 & nn. 10-11 (1983).

. For a history of the evolution of this provision to permit modification in progressively more circumstances, see Banks v. Chicago Grain Trimmers Ass’n, 390 U.S. 459, 461-64, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968).

. Earlier regulations were promulgated, of course, by the Secretary of Health, Education, and Welfare, under the authority to adjudicate claims from the initial application period. See Pittston Coal Group v. Sebben, 488 U.S. 105, 108-11, 109 S.Ct. 414, 102 L.Ed.2d 408 (1988) (discussing generally the historical series of regulations by the two departments and their relationships to one another).

.The regulations were amended substantively in December 2000 to set limits on the quantity and quality of evidence that can be submitted in a modification proceeding. However, those limitations were not applicable to claims pending on January 19, 2001, as Mr. Crowe’s was. See 65 Fed.Reg. 79920, 80057, 80069 (Dec. 20, 2000); 20 C.F.R. § 725.2(c) (2010); Zeigler Coal Co. v. OWCP, 490 F.3d 609, 615 n. 5 (7th Cir.2007) (noting that which of the various rules governs a black lung claim depends upon when the initial claim is filed).

. The statute provides that the modification authority rests with the "deputy commissioner,” a position that is now occupied by the "district director" in the DOL. We have long held that the regulations appropriately extend modification authority to the ALJs that conduct hearings when the mistake of fact alleged was committed by an ALJ. See Eifler v. OWCP, 926 F.2d 663, 665-66 (7th Cir.1991).

. Indeed, we went so far as to say that, "[t]o the extent that an ALJ determines that there are important reasons grounded in the language and policy of the Act that overcome the preference for accuracy, that determination should not be disturbed.” Hilliard, 292 F.3d at 547.

. At oral argument, it became apparent that Travelers is contesting its status as the surety in other litigation. For ease of reading, I continue to refer to it as the surety holder, as it has not been determined to be otherwise so far as we have been made aware.

. The panel majority opinion notes that the surety in Griskell sought to intervene just weeks after Melvin was issued, and Travelers first motion in this case was a year after the same decision. But the cases were at very different stages of litigation at that time. Grislcell was already on petition for review in our court, and Melvin would have required dismissal absent intervention, as a matter of jurisdiction. In the present case, as we already have discussed, the matter was sitting awaiting a decision on a motion for rehearing before the Board.

. The panel majority supports its decision on an interpretation of the statute and regulations that it believes required dismissal even without our guidance in Melvin and Griskell. Specifically, the majority takes the position that the statute and regulations require there to be a party in interest and direct the ALJ to dismiss a case when it has been abandoned by the proponent. The provisions the majority identifies, however, are not applicable to the situation at hand. The statute requires that "the application” for modification be made by a party in interest, 33 U.S.C. § 922, *458 and it was so made in this case, by Zeigler, prior to its dissolution. Although, as the panel majority notes, claims may be denied due to abandonment under the regulations, the abandonment regulation cross-references another section, detailing the reasons for which such a denial would be appropriate; that cross-referenced section mentions only actions by a claimant that result in abandonment, not by an opponent of a claim. See 20 C.F.R. § 725.310(c) (referencing § 725.409).

. Specifically, in a procedural order issued in 1994 and another in 2001, the ALJ denied the employer's requests to introduce evidence. In both denials, the ALJ noted that the employer previously had had ample time to submit evidence, but had failed to do so.

. Although we noted in Hilliard that an employer’s attempt to abuse the adjudicatory process to delay payment would justify denial of modification, 292 F.3d at 547, there is no allegation that this was the employer's course in this case. Modification was not sought for delay — it was sought for a redetermination of the merits with additional evidence.

.On the matter of nonpayment, the ALJ wrote:
I do not believe that the employer's delay in the payment of benefits to the claimant is a significant enough factor to justify denying employer’s request for modification. It does not establish that modifying the previous award of benefits would be a "manifest injustice," especially considering the "statu *460 tory preference for accuracy of benefits determination.” Old Ben Coal Co. v. Director, OWCP [Hilliard], 292 F.3d 533, [546] (7th Cir.2002). In this regard, I note that I agree that the employer’s newly developed medical evidence unquestionably demonstrates that I made mistakes of fact in finding the evidence was sufficient to prove the miner has pneumoconiosis and is totally disabled by the disease.
Decision and Order of ALJ at 6 (Jan. 30, 2009) (parallel citation omitted).

. On the matter of diligence, the ALJ conducted a brief review of the parties’ litigation strategies throughout the decades-long proceeding. In the ALJ's view, the employer had been justified in failing to put forward a vigorous defense in the first instance, because the claimant’s evidence in the initial proceeding was "weak,” and the agency’s approval of that strategy was evident in the claim’s denial. Decision and Order of ALJ at 4 (Jan. 30, 2009). After the case was remanded by the Seventh Circuit for reconsideration of "the medical evidence under a different standard of proof,” id. at 4-5, the ALJ noted that the employer sought to introduce further evidence; the ALJ further noted that he had denied that request, "despite the diligence of employer’s counsel to convince [him] otherwise.” Id. at 5. Finally, the ALJ credited the employer for seeking modification rather than appealing the award of benefits: "I find this to be a diligent decision, because an appeal may have proved futile to the employer based on the existing evidentiary record.” Id. Within the modification proceeding, the ALJ found that the newly developed record was "replete with evidence developed by the employer regarding the state of the claimant’s medical condition.” Id.

. Matter of Xonics, Inc., 813 F.2d 127, 130-31 (7th Cir.1987) ("Adverse decisions on interlocutory matters may be saved up to be appealed at the end of the case.... We have an appeal from the only 'final' decision, and in such an appeal all questions are open.”); 15A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3905.1 ("The prohibition against immediate appeal of most pretrial and trial orders established by the final judgment rule is offset by the rule that once appeal is taken from a truly final judgment that ends the litigation, earlier rulings generally can be reviewed.”).

. The complete reexamination of the evidence was within the scope of the remand order, which vacated the ALJ's “assessment of the evidence” and “instructed] him on remand to consider the employer’s modification request in accordance with the standard set forth in Hilliard.” Decision and Order of Board at 6 (Aug. 24, 2004). In the Board’s view, Hilliard required the agency to "give great weight to accuracy.” Id. at 5.